**FILED** IN CLERK'S OFFICE
U.S.D.C. Atlanta

*Dw*

AUG 2 9 2003

**LUTHER** D. THOMAS, Clerk
By: (*w*)   **Deputy Clerk**

**RECEIVED IN CLERK'S OFFICE**
U.S.D.C. Atlanta

MAY 27 2003

LUTHER D. THOMAS, Clerk
By: _____

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA ex rel.,
ROBERT J. ALLEN,
 Plaintiff,

v.

PHYSICIAN SPECIALISTS IN
ANESTHESIA, P.C., PHYSICIAN
SPECIALISTS IN PAIN MANAGEMENT,
INC., PHYSICIAN PAIN SPECIALISTS,
P.C., THE RESURGENS CENTER, INC.,
RESURGENS AND AFFILIATED
ORTHOPAEDISTS, P.C., RESURGEN'S
SURGERY CENTER, LLC, MEDAPHIS
PHYSICIAN SERVICES, INC.,
MEDAPHIS CORPORATION and PER-SE
TECHNOLOGIES, INC.,
 Defendants.

CIVIL ACTION FILE
NO. 1:01-CV-0854

## SECOND AMENDMENT OF COMPLAINT BY RESTATEMENT

**COMES NOW, ROBERT J. ALLEN**, Plaintiff in the above-styled action, by

and through his counsel of record, Harmon, Smith, Bridges & Wilbanks, LLP and files

this his Second Amendment of Complaint by Restatement.  This is an action brought

on behalf of the United States of America by ROBERT J. ALLEN (hereinafter

"Relator") against PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.,

PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT, INC., PHYSICIAN PAIN

**EXHIBIT "A"**

SPECIALISTS, P.C., THE RESURGENS CENTER, INC., RESURGENS AND

AFFILIATED ORTHOPAEDISTS, P.C., RESURGENS SURGERY CENTER, LLC,

MEDAPHIS PHYSICIAN SERVICES, INC., MEDAPHIS CORPORATION and

PER-SE TECHNOLOGIES, INC. (hereinafter sometimes collectively referred to as

"Defendants") pursuant to the *Qui Tam* provisions of the Civil False Claims Act, 31

U.S.C. §§ 3729-33.

This Second Amendment is filed to restate and amend the allegations within

Relator's Complaint and First Amended Complaint previously filed.  No answer,

defenses or responsive pleadings are required from Defendant regarding either said

Complaint or First Amended Complaint.  Relator's allegations are restated in their

entirety hereafter in this Second Amendment.

## JURISDICTION AND VENUE

1.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 31

U.S.C. §§ 3732(a) and 3730.  This Court has jurisdiction over this *qui tam* action.

Relator is the "original source" of the information set forth herein and as such he is

entitled to bring this action in the name of the United States as contemplated by the

Civil False Claims Act, 31 U.S.C. §§ 3729-33.

2.

Venue is appropriate as to each Defendant, in that one or more Defendants can be found in, reside in, and/or transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

3.

Relator has served a Disclosure Statement on the United States Government as required by 31 U.S.C. § 3730(b)(2).

## THE PARTIES

4.

Plaintiff Robert J. Allen is a citizen of the United States of America. He is a resident of Atlanta, Fulton County, Georgia, and resides at 1055 Balmoral Road, Atlanta, Georgia 30319. He brings this *qui tam* action based upon direct and unique information. He obtained such information during the period of his engagement as a consultant to and as Practice Administrator for Defendant Physicians Specialists in Anesthesia, P.C. and Defendant Physician Specialists in Pain Management, Inc.

5.

Defendant Physicians Specialists in Anesthesia, P.C. (hereinafter "Defendant PSA") is a medical practice specializing in anesthesia, critical care and pain management. Defendant PSA is a Georgia professional corporation which transacts business in the State of Georgia and within the Northern District of Georgia. Defendant PSA provided anesthesia medical services to numerous hospitals and ambulatory surgical centers ("ASCs"). Defendant PSA provided anesthesia services to the orthopedic ASC owned by Defendant The Resurgens Center, Inc. Defendant PSA's shareholders were licensed anesthesiologists. Defendant PSA may be served by serving its attorney of record, George A. Koenig, Esquire, at One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309. Even though Defendant PSA and Defendant Physician Specialists in Pain Management, Inc. (hereinafter "Defendant PSPM") are listed with the Secretary of State as being separate corporate entities with common owners, they have conducted themselves factually in a manner in which they should be characterized as being the same entity as a result of their conduct and commingled activities. Defendant PSA and Defendant PSPM will be sometimes referred to collectively hereafter as "Defendant Anesthesiologists".

6.

Defendant PSPM was a medical practice specializing in pain management that on occasion provided other anesthesia and critical care services. Defendant PSPM's shareholders were principally the same anesthesiologists that were the shareholders of Defendant PSA. Defendant PSA contracted to provide billing services, staff, equipment and administrative support to Defendant PSPM. Defendant PSPM was a Georgia for profit corporation which transacted business in the State of Georgia and within the Northern District of Georgia. Defendant PSPM is believed to have been dissolved in 1997. Service upon said Defendant may be made upon its attorney of record, George A. Koenig, Esquire, at One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309. As stated above, even though Defendant PSA and Defendant PSPM are, in a legal sense, separate corporate entities with common owners, they have conducted themselves factually in a manner in which they may be characterized as being the same entity as a result of their conduct and commingled activities.

7.

Defendant Physicians Pain Specialists, P.C. (hereinafter "Defendant PPS") is a medical practice specializing in pain management that also provides anesthesia and critical care services. Defendant PPS is a Georgia professional corporation formed in

1996 as the intended successor to Defendant PSPM. Defendant PPS's shareholders were principally the same anesthesiologists affiliated with Defendant PSA and Defendant PSPM. Defendant PPS has transacted business in the State of Georgia and within the Northern District of Georgia and is subject to the jurisdiction of this Court. Service may be made upon its attorney of record, George A. Koenig, Esquire, at One Atlantic Center, 1201 West Peachtree Street, Atlanta, Georgia 30309.

8.

Defendant PSA, Defendant PSPM and Defendant PPS will be collectively referred to hereafter as "Defendant Anesthesiologists" where appropriate.

9.

Defendant The Resurgens Center, Inc. owns and operates an ASC for orthopedic surgery and procedures. Defendant The Resurgens Center, Inc. contracted with Defendant PSA for ambulatory anesthesia services. In addition, by separate contract, Defendant The Resurgens Center, Inc. contracted for non-ambulatory pain management and anesthesia services with Defendant Anesthesiologists. Defendant The Resurgens Center, Inc. leased space from St. Joseph's Realty Corporation and subleased space to Defendant PSPM, as described hereafter. Defendant The Resurgens Center, Inc. is a Georgia for profit corporation which transacts business in the State of Georgia and within the Northern District of Georgia. Defendant The Resurgens

Center, Inc. may be served by serving its attorney of record, Charles C. Murphy, Jr., at 260 Peachtree Street, NW, Suite 1600, Atlanta, Georgia 30303-1202.

10.

Defendant Resurgens and Affiliated Orthopaedists, P.C. is a medical practice specializing in orthopedic medicine. Its shareholders are licensed orthopedic surgeons, whose principal base of patient operation is located at St. Joseph's Hospital of Atlanta. Its shareholders are believed to be the same shareholders who own Defendant The Resurgens Center, Inc. Defendant Resurgens and Affiliated Orthopaedists, P.C. is a Georgia professional corporation which transacts business in the State of Georgia and within the Northern District of Georgia. Defendant Resurgens and Affiliated Orthopaedists, P.C. may be served by serving its attorney of record, Charles C. Murphy, Jr., at 260 Peachtree Street, NW, Suite 1600, Atlanta, Georgia 30303-1202.

11.

Defendant Resurgens Surgery Center, LLC is a Georgia limited liability company formed on May 29, 1998 for the purpose of providing for the sale of 15% ownership in Defendant Resurgens Center, Inc. to Ortholink Physicians by and through an "asset sale" to Defendant Resurgens Surgery Center, LLC. Substantially all of the assets of Defendant Resurgens Center, Inc. were sold to Defendant Resurgens Surgery Center, LLC to include the continuing operation of the ASC at the same location

staffed with former Resurgens Center, Inc. employees. The purchase transaction occurred on or about October 1, 1998. Defendant Resurgens Surgery Center, LLC continued the business and medical operation of the ASC at the same location and premises of Defendant Resurgens Center, Inc. using the CON issued to Defendant Resurgens Center, Inc. The ownership of Defendant Resurgens Surgery Center, LLC remained substantially the same. Defendant Resurgens Center, Inc. retained 85% of the ownership of Defendant Resurgens Surgery Center, LLC. Defendant Resurgens Surgery Center, LLC's principals had knowledge and were aware of the prior misconduct alleged hereafter and the ongoing liability for such misconduct as to Defendant Resurgens Center, Inc. through its members, shareholders, officers, and directors. Under principles of "successor liability" and "alter-ego", said Defendant is subject to the liability of its predecessor, Defendant Resurgens Center, Inc. Defendant Resurgen's Surgery Center, LLC may be served by service of process on its registered agent CT Corporation System, 1201 Peachtree Street, Atlanta, Georgia 30361.

12.

Defendant The Resurgens Center, Inc., Defendant Resurgens and Affiliated Orthopaedists, P.C. and Defendant Resurgens Surgery Center, LLC will be collectively referred to hereafter as "Defendant Resurgens" where appropriate.

13.

Defendant Medaphis Physicians Services, Inc. was the billing and data processing company engaged by Defendant Anesthesiologists in the Fall of 1995 to handle all billing activities with Medicare, Medicaid and third-party payors. In mid-1999, its parent company, Defendant Medaphis Corporation, merged with its subsidiaries, Per-Se Technologies, Inc. and Defendant Medaphis Physicians Services, Inc. The surviving corporation is Defendant Per-Se Technologies, Inc. (hereinafter "Defendant Per-Se"). Defendant Per-Se is a Delaware corporation. Defendant Per-Se has transacted business in the State of Georgia and within the Northern District of Georgia and is subject to the jurisdiction of this Court. Defendant Per-Se may be served by serving its attorney of record, Paul J. Quiner, at 2840 Wilkinson Parkway, Atlanta, Georgia 30339. These Defendants will be referred to collectively hereafter as "Defendant Medaphis" where appropriate.

14.

Upon the filing of this amendment, Relator intends to dismiss claims against Defendants The Physicians' Pain & Rehabilitation Specialists of Georgia, P.C., Ortholink Physicians Corporation, United Surgical Partners International, Inc. and St. Joseph's Hospital of Atlanta, and to add as an additional defendant, Resurgens Surgery Center, LLC.

## **GENERAL BACKGROUND INFORMATION**

15.

The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States and is funded by taxpayer revenue.  It is overseen by the United States Health and Human Services Department.  Medicare was designed to assist participating states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify for Medicare.

16.

The Medicaid Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (hereinafter "Medicaid") is a health insurance program administered by the Government of the United States and is funded by State and Federal taxpayer revenues. It is overseen by the United States Health and Human Services Department. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to individuals that qualify for Medicaid. Medicare and Medicaid will be referred to collectively hereafter as "Federal Health Care Programs" where appropriate.

17.

The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) makes knowingly presenting, causing to be presented, or conspiring to present to the United States any false or fraudulent claim for payment a violation of Federal Law punishable by three times the amount of the actual damages the government sustains AND a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

18.

The FCA, 31 U.S.C. § 3729(a)(2) makes knowingly presenting, causing to be presented, or conspiring to make or use a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law punishable by three times the amount of the actual damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

19.

The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such

contractor, grantee, or other recipient for any portion of the money or property which is requested.

20.

The Anti-Kickback Act ("AKA"), 42 U.S.C. §1320a-7b (b), makes it illegal to offer, receive, or solicit any re-numeration, kickback, bribe, or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to any person in order to induce such person to purchase, lease, or order, or to arrange for or recommend the purchasing, leasing, or ordering of any good, service, or item for which payment may be made in whole or in part under Federal Health Care Programs.

21.

The AKA seeks to prohibit such activities in order to secure proper medical treatment and referrals, and to limit the possibility of a patient having to undergo unnecessary treatments or having to accept specific items or services which are based not on the needs of the patient but on the incentives given to others, thereby limiting the patient's right to choose proper medical care and services.

## AMBULATORY SURGICAL CENTER AND CERTIFICATE OF NEED STATUTORY AND REGULATORY REQUIREMENTS

22.

§ 1832(a)(2)(F)(i) of the Social Security Act ("The Act") provides that benefits

under the Medicare Supplementary Medical Insurance Program ("Part B") include

payment for facility services (said payment is referred to hereafter as a "facility fees")

furnished in connection with surgical procedures specified by the Secretary in

accordance with § 1833(i)(1)(A) of The Act. The Secretary is to review and update the

ASC list bi-annually.

23.

To participate in the Medicare Program as an ASC, a facility must meet the

standards specified under § 1832(a)(2)(F)(i) of The Act and 42 CFR 416.25, which

sets forth general conditions and requirements for ASCs. 42 C.F.R. 416.40 requires as

an express condition for allowance of facility fees in an ASC that it be in compliance

with State licensure laws.   42 C.F.R. 416.25 further requires that the basic

requirements of participation as an ASC is limited to those facilities that meet the

definition of § 416.2 and have in effect an agreement obtained in accordance with the

subpart.

24.

42 C.F.R. 416.2 defines an ASC as any distinct entity "that operates exclusively

for the purpose of providing surgical services to patients not requiring hospitalization,

has an agreement with HCFA to participate in Medicare as an ASC, and meets the

conditions set forth in Subpart B and C of this Part." ASC services are defined by this

latter regulation to mean facility services that are furnished in an ASC. Covered surgical procedures means those surgical and other medical procedures that meet the criteria specified in § 416.65 and published by HCFA in the Federal Register. Facility services means services that are furnished in connection with covered surgical procedures performed at an ASC, or in a hospital on an outpatient basis. Facility fees are generated from those facility services as defined.

25.

Generally, there are two primary elements in the total cost of performing a surgical procedure. The first is the cost of the physician's professional services for performing the procedure, and the cost of services furnished by the facility where the procedure is furnished (for example, surgical supplies and equipment and nursing services). 42 C.F.R. § 1833(i)(2)(A) of The Act addresses what the ASC facility fees are intended to represent and how the amount of the Medicare payment for ASC facility fees is to be determined. HCFA reviews and updates ASC payment amounts annually.

26.

The ASC payment rate is to be a standard overhead amount established on the basis of HCFA's estimate of a fair fee that takes into account the costs incurred by ASCs generally in providing facility services in connection with performing a specific

- 14 -

procedure.  Payment for ASC facility services is made under Medicare Part B which must be adjusted for deductibles and co-insurance requirements.  Therefore, Medicare pays participating ASCs 80% of the determined rate adjusted for regional wage variations.

27.

The majority of states require state licensure for ASCs.  These states specify the criteria that ASCs must meet for licensure.  In Georgia, the State Division of Health Planning, a part of the Georgia Department of Community Health, is responsible for administering reviews of certain proposed health care projects under Georgia's Health Planning Statute, O.C.G.A. Title 31, Chapter 6.  The regulations themselves provide explicit interpretations of the laws and thereby serve as a detailed procedure manual.

28.

Georgia requires a Certificate of Need ("CON") for all ASCs.  O.C.G.A. § 31-6-1 et al. requires that a CON must be obtained prior to the commencement of providing services at an ASC.

29.

Defendant Resurgen's ASC made its application for a CON in 1992 (Application No. GA 098-92).  According to the subsequently granted CON, the ASC operated by Defendant Resurgens was limited to a physician owned limited purpose

practice (orthopedics practice only). Defendant Resurgen's ASC's CON was granted under Rule 272-2-09(i)(b)(8)(i). See said CON attached as Exhibit 16.

30.

In order to be reimbursed under Medicare Part B, the place of service for such services performed in an ASC must be a "free standing facility, other than a physician's office, where surgical and diagnostic services are provided on an ambulatory basis." Such ASC facility fees must be billed to Medicare on an assigned basis. The ASC facility must also be on Medicare's list of approved ASC facilities in order to receive payment from Medicare. Such a list is published by HCFA each year in April in the Medicare Part B Annual Reference Newsletter.

31.

Medicare will only reimburse facility fees for approved surgical procedures performed in an ASC. Medicare will not reimburse facility fees for pain management service provided in an ASC. Similarly, Medicare will not reimburse facility fees for services rendered incident to unapproved surgical procedures. However, physicians and qualified non-physician practitioners may bill Medicare for procedures not on the Medicare approved ASC list but performed in an ASC. In that event, Medicare will pay at the non-facility rate according to the physician fee schedule (i.e., using the non-facility practice expense Relative Value Unit ("RVU"), for such procedures when

covered by Medicare).  The Medicare physician fee schedule allows a limited payment

for procedures not on the ASC list but performed in an ASC.  Said physician fee

includes reimbursement for practice expenses, but there is no separate payment of an

ASC facility fee.

32.

Examples of services that are not to be included as a part of facility fees paid by

Medicare are as follows:

1.   Physician services;

2.   The sale, lease or rental of durable medical equipment to ASC patients

     for use in their homes;

3.   Ambulance services;

4.   Braces;

5.   Services furnished by an independent lab; and

6.   Services furnished by an anesthesiologist. Note: Each physician service

     referenced hereafter which forms the basis of Relator's Complaint was

     provided in an orthopedic ASC by Defendant Anesthesiologists.

33.

Pursuant to 42 C.F.R. 416.61(b), the services of anesthesiologists are expressly

excluded from reimbursement for facility fees.  The Georgia CON program is a state

- 17 -

statute that expressly provides that no new institutional health services or health care facilities are allowed to operate in Georgia except pursuant to either an express exemption or upon the obtaining of a CON. O.C.G.A. § 31-6-40(a). In this case, Defendants received neither an express exemption nor a CON to provide or bill for pain anesthesia or pain management services in an ASC.

34.

Said statute expressly limits a CON to the defined scope, location, cost, service area and person named in an application. The Georgia statute further provides, pursuant to O.C.G.A. § 31-6-45(a)(b) and (c), that not obtaining a CON will result in the denial of a license to operate. This statute further provides for a $5,000 per day violation for each day in which there has existed a knowing and willful violation.

## FACTS AND ALLEGATIONS REGARDING FRAUDULENT ACTS COMMITTED BY DEFENDANTS

35.

Relator began to consult with Defendant Anesthesiologists while working for Paragon Consulting in December, 1995. Beginning in January 22, 1996, Relator was employed by Defendant Anesthesiologists as its Practice Administrator. His duties included the supervision and management of the medical practices regarding their daily operations, personnel and staff. He was also responsible for oversight of financial,

billing and accounting matters.   Relator left his employment with Defendant Anesthesiologists in January 1997.

36.

In his capacity in 1995 as a consultant and thereafter beginning in January 1996 as an employee of Defendant Anesthesiologists, Relator became familiar with and knowledgeable of various aspects of their business practices.  He regularly interacted with their financial, operational, billing and medical personnel.  Relator makes these allegations based upon facts and information he obtained during the term of his engagement as a consultant and his subsequent employment with Defendant Anesthesiologists.   As stated previously, Relator is the original source of the information to the United States Government set forth herein.

37.

Relator has gained a detailed knowledge of the policies and procedures required by Defendant Anesthesiologists of their personnel.  Relator also gained a personal understanding of the policies and procedures utilized by Defendant Anesthesiologists and other Defendants in committing, ratifying and assisting with the fraudulent activities and billing practices revealed herein.

38.

Relator had direct and systematic communications with the shareholders, officers and directors of Defendant Anesthesiologists, Defendant Resurgens and Defendant Medaphis. He regularly collaborated with Defendant Anesthesiologists, physicians, employees, executive officers, board members and personnel. Much of the factual information contained within this Complaint was provided directly to Relator by the physicians and officers of Defendant Anesthesiologists at financial meetings and board meetings.

39.

Additionally, as a result of Relator's position of authority as Practice Administrator for Defendant Anesthesiologists, he had open and unfettered access to important relevant financial data relating to the Medicare and Medicaid fraud committed by Defendant Anesthesiologists. A substantial portion of Defendant Anesthesiologists gross charges were made to Medicare beneficiaries. Defendant Anesthesiologists' billing records reflect that approximately 29% of its charges are related to Medicare beneficiaries. Defendant Anesthesiologists also provided anesthesia and pain management services to Medicaid beneficiaries. The Medicaid mix is much smaller, comprising of approximately 2%-3% of charges during the years in question.

40.

Prior to Relator's employment, the shareholder anesthesiologists of Defendant PSA formed Defendant PSPM, a Georgia professional corporation, in February 1992. The shareholders of Defendant PSPM were also the shareholders of Defendant PSA (see Exhibits 1 and 2).

41.

Defendant PSPM was formed for the purpose of providing pain management, anesthesia and related services. Defendant PSPM entered into numerous contracts with Defendant Resurgens and Defendant PSA to provide other purported services (see Exhibits 3-7). These other purported services were a sham. The primary intent of Defendants was to generate additional Medicare and Medicaid dollars in the form of facility fee reimbursements.

42.

As stated above, a condition precedent to the operation of an ASC requires compliance with State of Georgia licensure requirements. One such requirement involves a CON. (See 42 CFR 416.40, 42 CFR 416.25.) Without a valid CON, facility fees can not be billed to or paid by Federal Health Care Programs for services rendered in an ASC.

43.

Defendant Anesthesiologists could not obtain a CON to perform pain management services. Early in 1996, Defendant Anesthesiologists asked Relator to attempt to obtain a CON for pain management. He informed Defendant Anesthesiologists that a CON could not be obtained for pain management services. At all times in question, CONs were not obtainable from the State of Georgia for pain management. Without a CON, Defendant Anesthesiologists could not legally file claims or bill the Government for facility fees relating to the delivery of anesthesia or pain management services. Neither Defendant PSA nor Defendant PSPM had a Medicare/Medicaid number that would allow them to bill a facility fee (see Exhibits 8-11).

44.

Conversely, Defendant Resurgens had a CON. Defendant Resurgens' CON was expressly limited to orthopedic surgical services. Medicare would pay a facility fee for orthopedic services provided in the ASC operated by Defendant Resurgens pursuant to the limited terms of its CON. Defendant Resurgens' CON did not allow Defendants to bill the Government for facility fees related to the delivery of anesthesia and pain management services by Defendant Anesthesiologists in the ASC (see Exhibit 16).

45.

Despite the existence of the above limitations, the Defendants conspired and created a fraudulent scheme whereby Defendant Anesthesiologists and Defendant Resurgens would receive facility fees from Federal Health Care Programs for anesthesia and pain management services (hereafter collectively referred to as "pain management services") provided by Defendant Anesthesiologists to patients treated at Defendant Resurgens' ASC.  The scheme was blatantly illegal and fraudulent.

46.

The success of the fraudulent scheme depended upon the following cooperative actions between Defendants:

(a)     Defendant Anesthesiologists would illegally cause Federal Health Care Programs to be billed for the pain management services they provided in Defendant Resurgens' ASC using Defendant Resurgen's provider number (the provider number of the Defendant Anesthesiologists that actually provided said services were not used on claims submitted to the Government);

(b)     Because Defendant Resurgens had a limited use CON for orthopedic services only, Federal Health Care Programs would be deceived into paying facility fees for the ASC space utilized for the pain management

services provided by Defendant Anesthesiologists in the ASC. Defendants deceived Federal Health Care Programs by disguising the physician provider number and the true nature of the services rendered in Defendant Resurgens' ASC;

(c)     No orthopedic services were provided in the ASC by Defendant Anesthesiologists. Defendant Anesthesiologists were anesthesiologists (none were orthopaedists). Despite the absence of a CON authorizing pain management services, Defendants were able to provide pain management services in the ASC at issue and to obtain illegal facility fees by allowing Defendant Anesthesiologists to surreptitiously use Defendant Resurgen's provider number and CON to defraud Federal Health Care Programs. The bills and facility fee claims generated by Defendant Anesthesiologists were falsified in order to make it appear that anesthesia and pain management services were orthopedic services and/or provided incident to approved ASC procedures. These misrepresentations were false and Federal Health Care Programs would not have paid any facility fees to any of the Defendants if the true circumstances were known;

(d)     The illegal facility fees were paid by Federal Health Care Programs and sent by check made payable to Defendant Resurgens to a special lockbox

address designated by Defendants. A separate lockbox was established by Defendants to receive cash and checks from patients and third party managed care entities for facility fees. When the checks arrived, Defendant Anesthesiologists and Defendant Resurgens accepted and split the facility fees on a monthly basis;

(e)   As set forth in detail hereafter, the illegal arrangement was very profitable. Defendants received facility fees that they would not have received otherwise and they benefited from the referral of each patient involved in the fraudulent scheme. These actions violated the FCA and the AKA;

(f)   According to documents prepared by Defendants payor entities such as Blue Cross Blue Shield of Georgia, Aetna, State Merit, Bellsouth and Metlife also paid facility fees to Defendants relating to pain management services rendered by Defendant Anesthesiologists in the ASC;

(g)   Defendants further profited by retaining co-pays and deductibles from patients treated by Defendant Anesthesiologists in the ASC.

47.

While employed by Defendant Anesthesiologists, Relator learned that the conspiracy between Defendants pre-dated his employment. The documents executed

between Defendants which directly relate to the conspiracy complained of herein were dated as far back as 1993. On May 1, 1993, Defendant Anesthesiologists entered into a "Contract Labor Agreement" (Exhibit 5).  Said agreement provided for the employment by Defendant PSPM of the clinical nurse employees and administrative staff of Defendant PSA.  In reality, the terms of said contract were never factually implemented.  Defendant PSA continued to directly employ all staff and bill to Medicare and Medicaid directly (rather than Defendant PSPM employing staff or billing Medicare/Medicaid for services).

48.

On April 5, 1993, Defendant Anesthesiologists and Defendant Resurgens entered into a contract entitled "Agreement for Services" (Exhibit 3) which provided for the providing of consulting, billing and administrative services by Defendant Anesthesiologists to Defendant Resurgens and for the exclusive rental by Defendant Anesthesiologists of certain surgical space located within the ASC operated by Defendant Resurgens (hereafter "Agreement"). The Agreement calls for a payment of a "facility fee" by Defendant Anesthesiologists.  However, in reality, the "facility fee" was in fact being paid by Medicare/Medicaid on behalf of the patients treated by Defendant Anesthesiologists within the ASC operated by Defendant Resurgens. Other equipment lease arrangements and expense reimbursements were also provided by the

Agreement, its amendments and related written agreements (see Exhibits 3-7).

49.

On October 1, 1993, the Agreement was amended to provide for the rental and usage of a C-Arm X-Ray Unit to Defendant Resurgens owned either by Defendant PSA or Defendant PSPM (see Exhibit 7).

50.

These 1993 Agreements were a "sham" and constituted an intentional and unlawful scheme to defraud the United States Government and Federal Health Care Programs by illegally obtaining facility fee payments related to anesthesia and pain management services to be divided between Defendants.

51.

In 1995, Defendant Anesthesiologists approached Defendant Medaphis and asked said corporation to handle its billing functions. Defendant Medaphis is now merged into Defendant Per-Se Technologies, Inc. Defendant Medaphis is a collection and billing agency for medical practices. Defendants wanted Defendant Medaphis to assume responsibility for all of Defendant Anesthesiologists' business.

52.

Defendant Anesthesiologists were advised by Defendant Medaphis in the Spring of 1995 that they would not handle the collection or billing of matters relating to the

PSA/PSPM/Resurgens arrangement because it was "illegal" and "fraudulent" under Medicare/Medicaid regulations.  Relator was told that the attorney for Defendant Medaphis had reviewed the arrangement and advised Defendant Medaphis of its illegality. Notwithstanding said illegality, Defendant Medaphis thereafter took over the collection and billing of Defendant Anesthesiologists' accounts, with the exception of Defendant PSPM's facility fee billing.  Defendant Medaphis continued to handle the billing of the professional fees generated by the anesthesiologists practicing within Defendant Resurgens' ASC.  Defendant Medaphis did not disclose such unlawful conduct to the Government.  However, in exchange for the money obtained from its ongoing billing contract, Defendant Medaphis continued to provide accounting support which included reporting and calculating both the unlawful facility fees and professional fees received by Defendants on a monthly basis.  Accordingly, Defendant Medaphis aided and abetted the other Defendants in the fraudulent reimbursement scheme describe herein.

53.

Relator also informed Defendants as to the illegality of these arrangements. Soon after being employed in January 1996, Relator expressly advised Defendant Anesthesiologists that their service and billing arrangements with regard to billing for pain management in an ASC was unlawful.  He further advised that the billing and

sharing of unauthorized facility fees were unlawful.

54.

Even after being confronted with the illegality of the arrangements and practices set forth above by Defendant Medaphis and its own Practice Administrator, Defendants continued to illegally bill and collect facility fees into 1997 from Medicare, Medicaid and third party payors and patients (see Exhibit 9). To the extent that illegal facility and/or professional fees were billed after January 1, 1997, the penalties of 18 U.S.C. 1247 apply.

55.

Defendant PPS became the successor to the patient base, equipment and furnishings of Defendant PSPM upon the latter's ceasing business in January 1997 (see Exhibit 12). Defendant PPS continued these illegal billing practices.

56.

A large number of patients were treated by Defendant Anesthesiologists in Defendant Resurgens' ASC. Defendant's records indicate that 4,297 patients were treated in 1994. Another 4,399 patients were treated in 1995. Over 3,600 patients were treated in 1996. At the time of Relator's departure in early 1997, Defendant Anesthesiologists were still providing anesthesia and pain management services for a high volume of patients in the ASC. All facility fees billed by Defendants for the

services provided to patients in the ASC by Defendant Anesthesiologists were improper. Each submission of a facility fee claim to Federal Health Care Programs constituted improper false claims.

57.

In 1995, financial records show that $1,264,834 of facility fees were billed by Defendant Anesthesiologists for work done in the ASC. These figures were computed by Defendant Medaphis as part of the monthly billing services provided to Defendants. These figures were openly discussed at the monthly board meetings attended by Relator, Defendant Anesthesiologists and Defendant Medaphis (see Exhibits 8-11, 13).

58.

The fraudulent scheme generated large revenues for Defendants in 1996 as well. By way of example, Defendant Anesthesiologists charged $1,282,859 from January through September, 1996. Business records reflect receipts of $891,306 for the same period. As noted above, the Medicare patient mix was approximately 29% during the relevant time frames. Defendants' financial records also showed Defendant Resurgens had charges of $796,901 and receipts of $591,785 for the same period (see Exhibit 15).

59.

The budget relating to pain services to be provided within the ASC prepared for Defendant Anesthesiologists for the first quarter of 1997 revealed a budget of $65,950

- 30 -

in January, $59,366 in February, $95,510 in March and $91,301 in April, 1997. This budget was based upon expected revenues to be billed and received from pain management services provided by Defendant Anesthesiologists in the ASC (see Exhibit 14).

60.

The attorneys for Defendant Anesthesiologists were aware of the facility fee scam. The unlawful collection of facility fees was expressly discussed at monthly board meetings of the Board of Directors of Defendant Anesthesiologists. At board meetings beginning in February 1996 and continuing through Relator's employment, Defendant Anesthesiologists and Attorney F. Edwin Hallman were present in addition to Relator. Representatives of Defendant Medaphis were also present. In fact, it was Hallman who proposed to the doctors that they "stop" the illegal billing after Drs. Rizor, Porter McNeil left the practices. It was discussed that the "blame and responsibility" for such illegal arrangements and billings would be placed on Drs. Rizor, Porter and McNeil after they left Defendant Anesthesiologists in the event the scheme was discovered by the Government. Dr. Rizor left his employment with Defendants PSPM and PSA in October 1995 and Drs. Porter and McNeil left their employment with Defendant PSPM in February 1996. During Relator's employment with Defendant PSA, Dr. Sween chaired each meeting of the Board. As stated above,

- 31 -

Defendant Anesthesiologists continued to illegally bill Medicare and Medicaid for facility fees and other ASC services through Defendants PSPM and PPS for a period of time even after Drs. Rizor, Porter and McNeil left PSPM. Based upon information and belief, Defendants continued to bill private payors and private insurance companies for ASC facility fees even after said Defendants ceased billing Federal Health Care Programs for the same services.

61.

As a result of these contractual arrangements between Defendant Anesthesiologists and Defendant Resurgens, Defendants were able to obtain additional patient referrals illegally. These improper referrals or "kickbacks" were based in part upon the financial incentives created by the illegal facility fee-splitting arrangement between Defendants. The express agreements between Defendant Anesthesiologists and Defendant Resurgens to collect and divide financial payments created an unlawful financial incentive for cross-referrals. (See 1128B(b) of the Social Security Act and 42 U.S.C. 1320a-7b(b)).

62.

These arrangements between Defendants enhanced their mutual "patient pool" and encouraged referrals between Defendants. The fraudulent scheme constituted an unlawful referral enticement involving kickbacks between Defendants.

63.

The contracts between Defendant Anesthesiologists and Defendant Resurgens violated the "anti-kickback" rules. For example, if the anesthesiologist providing pain management services (who has an indirect investment in the ASC and receives compensation therefrom) is in a position to refer patients to the ASC, he or she must satisfy several requirements to avoid "anti-kickback" rules. One of these requirements is that "all ancillary services must be directly and integrally related to primary procedures performed at the ASC and none may be separately billed to Medicare or Medicaid". The pain management services were not integrally related to orthopedic surgeries done in the ASC. Additionally, the ASC space must be dedicated exclusively to the ASC and not used for the treatment of the hospital's inpatients or outpatients. See 64 Fed Reg 223 (November 19, 1999). These requirements were blatantly violated by Defendants. Patients were routinely transported between St. Joseph's Hospital and Defendant Resurgens' ASC. Frequently Defendant Anesthesiologists provided pain management services to St. Joseph's patients and then they were taken back to the hospital. Medicare/Medicaid was then billed by Defendant Resurgens for ancillary pain services provided in the ASC.

64.

The agreement and conduct of these Defendants prove that Defendants knowingly and willfully received payments and financial gain for influencing the referral of patients for ASC anesthesia and pain management services to Defendant Resurgen's ASC in violation of the FCA, Medicare/Medicaid and AKA laws and regulations.

65.

In summary, the contractual arrangements and billing practices between Defendants provided for and contemplated the wrongful billing for pain management and other anesthesia services, the payment of a "facility fee" and other financial payments arising out of pain management services provided by Defendant Anesthesiologists in the ASC.

66.

The Defendants in the case have violated the FCA and AKA by knowingly making, using or causing to be made or used false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the Government, thereby causing damage to the Federal Health Care Programs that would not have occurred but for the violations of the law as set forth herein.

67.

Said Defendants obtained reimbursements from the Government for services and expenses which would not have been paid if not for the false claims, certifications and documents submitted to Federal Health Care Programs by Defendants.

68.

These billings by Defendants from 1995 through 1997 constituted false claims and false certifications, thereby entitling the Government to disallow all billings of these Defendants related to the anesthesia and pain management services complained of herein.

## **SUMMARY OF FRAUDULENT SCHEMES**

69.

Defendants' schemes included, but were not limited to, the following actions, all of which violate the FCA and AKA:

(a)     Conspiring to obtain and divide facility fees that were illegal and improper;

(b)     Allowing Defendant Anesthesiologists to utilize Defendant Resurgens' provider number in furtherance of the facility fee schemes;

(c)     Allowing Defendant Anesthesiologists to utilize Defendant Resurgens' CON in furtherance of the facility fee schemes;

(d)     Conspiring to disguise anesthesia and pain management services provided by Defendant Anesthesiologists as being services related to approved orthopedic services provided by physicians within Defendant Resurgens' ASC;

(e)     Conspiring to create a paper trail involving bogus rent and equipment payments ostensibly owed by Defendant Anesthesiologists to Defendant Resurgens in order to disguise the splitting of the facility fees between Defendants;

(f)     Conspiring to hide the existence of the facility fee scheme referenced above during the accreditation process by orchestrating the abandonment of the ASC premises by physicians and employees of Defendant Anesthesiologists during accreditation visits;

(g)     Conspiring to hide the fact that Defendant Anesthesiologists had no CON authorizing the billing of facility fees for pain management services provided during the relevant timeframe;

(h)     Conspiring to hide the fact that Defendant Anesthesiologists did not provide orthopedic services as required by the CON applicable to the ASC operated by Defendant Resurgens during the applicable timeframe;

(i)     Conspiring to create unlawful incentives which were provided in

exchange for patient referrals to the ASC and business between Defendants;

(j)   Conspiring with others to solicit and accept kickbacks (in the form of facility fee revenues and physician charges generated from patient referrals between Defendant Anesthesiologists and Defendant Resurgens);

(k)   Conspiring to make and use false records and statements to get false claims paid by the Government;

(l)   Knowingly making and using false records and statements in order to obtain facility fees and professional fees from the Government;

(m)   Conspiring to calculate and quantify the revenues generated from the schemes, including revenues paid by Federal Health Care Programs, and to maintain the secrecy of said calculations to avoid detection by the Government; and

(n)   Other unlawful activities described herein in this Complaint.

70.

The effect of the fraudulent schemes described in the following paragraphs has been to cause overpayments to be made for the benefit of Defendants and to the detriment of Medicare and Medicaid.

## COUNT I

## VIOLATIONS OF THE FALSE CLAIM ACT

71.

Relator restates and realleges the allegations contained in 1-70 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

72.

Defendants knowingly presented or caused to be presented false or fraudulent claims to Federal Health Care Programs and knowingly made, used or caused to be made or used false statements to get said claims paid by Federal Health Care Programs. As a result of the illegal schemes set forth herein, illegal facility fees and professional fees were paid by Federal Health Care Programs to Defendants. As a result of said illegal schemes, the claims presented or caused to be presented by Defendants were improper in whole. Defendants knowingly violated the Civil False Claims Act, 31 U.S.C. § 3729(a)(1)-(2).

73.

Defendants knowingly and intentionally received illegal payments for facility fees rendered in an ASC that was not licensed to provide the anesthesia or pain management services performed by Defendant Anesthesiologists. Defendants illegally

billed Federal Health Care Programs and received inflated payments for professional fees for anesthesia and pain management services rendered in the ASC.

74.

Defendants utilized false records to support their claims for facility fees and professional fees. Defendant Anesthesiologists disguised the anesthesia and pain management services provided by said Defendants through the use of Defendant Resurgen's provider number and CON status.

75.

Defendants used false records and made illegal and fraudulent representations to Federal Health Care Programs regarding the "place of service" for the professional and pain management services at issue.

76.

To mask the facilities fee split, revenue sharing and kickbacks described above, Defendant Resurgens filed cost reports which contained misleading and false information.

77.

Defendants knowingly concealed their actions and failed to alert the Government as to the illegality of said actions.

## COUNT II

## CONSPIRACY TO DEFRAUD

78.

Relator restates and realleges the allegations contained in 1-77 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

79.

Defendants knowingly conspired to defraud the United States for the purpose of obtaining illegal facility fees and professional fees as set forth above.

80.

Additionally, Defendants knowingly conspired to violate the False Claims Act by acting together to cause false or fraudulent claims to be filed and to make or use false statements and documents which damaged Federal Health Care Programs.

81.

The Defendants conspired to obtain money, kickbacks and patient referrals to the detriment of Federal Health Care Programs and the taxpayers of the United States of America.

82.

Defendant Medaphis also actively aided and abetted the fraudulent scheme set forth above. They were aware of the illegal billing of facility fees and chose not to notify the Government of said illegal actions. Moreover, Defendant Medaphis continued to handle the professional billing and collection work for Defendant PSA throughout the times in question. Defendant Medaphis also provided monthly financial information to Defendant Anesthesiologists regarding the amount of the illegal facility fees paid by the Federal Health Care Programs. Defendant Medaphis made an accounting of these amounts and presented financial data incorporating the computations of the illegal facility fees to the Defendants at monthly board meetings from February 1996 through at least 1997.

## COUNT III

### VIOLATIONS OF THE ANTI-KICKBACK ACT ("AKA") AND STARK ACT ("STARK")

83.

Relator restates and realleges the allegations contained in 1-82 above as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

84.

Defendants have offered, received and solicited illegal patient referrals, kickbacks and remunerations in violations of the AKA and STARK. See 42 U.S. C. § 1396nn(g)(1). In order to induce Defendant Anesthesiologists to perform anesthesia and pain management services within its ASC, Defendant Resurgens paid approximately one-half of the facility fees generated from said services to Defendant Anesthesiologists.

85.

Defendant Resurgens also received compensation for the rental of the space utilized by Defendant Anesthesiologists in the ASC and equipment rental.

86.

Defendant Resurgens also benefited from the referrals obtained from the other conspirators and said Defendant benefited from having Defendant Anesthesiologists perform anesthesia and pain management service within the ASC operated by Defendant Resurgens. Similarly, Defendant Anesthesiologists benefited financially to the detriment of the taxpayers. Said Defendants received a facility fee that they were not otherwise entitled to and they would not have received but for the illegal conspiracy and kickbacks existing between Defendant conspirators.

87.

Defendant Anesthesiologists received space in which to perform anesthesia and pain management services, equipment and the illegal use of Defendant Resurgen's provider number and CON to utilize in the presenting of false claims to the Federal Health Care Programs.

WHEREFORE, Relator, ROBERT J. ALLEN, acting on behalf of and in the name of the United States of America and on his own behalf, demands and prays that judgment be entered as follows:

(a)     In favor of the United States against each Defendant, jointly and severally, and for treble the amount of damages to the Federal Health Care Programs from the false and fraudulent claims referenced above, plus maximum civil penalties of $10,000.00 for each false claim;

(b)     In favor of the United States against Defendants, jointly and severally, for disgorgement of the profits earned by Defendants as a result of their illegal schemes;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), to include statutory reasonable expenses, attorneys' fees and costs incurred by Relator;

(d)     For all costs of this civil action;

(e)     In favor of the Relator and the United States for such other and further

relief as this Court deems to be just and equitable; and

(f)     Relator demand a trial by jury be had as to the allegations against each

Defendant as set forth herein.

This _____ day of _____, 2003.

Respectfully submitted,

HARMON, SMITH, BRIDGES & WILBANKS

By: _____
        MARLAN B. WILBANKS
        Georgia Bar No. 758223

By: _____
        TYRONE M. BRIDGES
        Georgia Bar No. 081500

Attorneys for Relator ROBERT J. ALLEN

1795 Peachtree Road, NE
Suite 350
Atlanta, Georgia  30309-2339
(404) 881-1200

## PHYSICIAN SPECIALISTS IN ANESTHESIA

Randy Rizor, MD
John G. Porter, MD
Charles A. MacNeil, MD
John J. Byrne, MD
James L. Carlson, MD
Donn Chambers, MD
Alice Lachenal Dijamco, MD
Rex B. Foster, III, MD
Thomas W. Lebert, II, MD
Richard R. Little, MD
Donald S. McLeod, MD
Stanley R. Mogelnicki, MD
Anthony Schinelli, MD
John H. Stephenson, MD
Steven L. Sween, MD
William M. Taylor, MD
Philip H. Wells, MD
Frederick P. Yilling, MD

**EXHIBIT "1"**

000001

## PHYSICIAN SPECIALIST IN PAIN MANAGEMENT

Randy Rizor, MD
John G. Porter, MD
Charles A. MacNeil, MD
James L. Carlson, MD
Donn Chambers, MD
Alice Lachenal Dijamco, MD
Rex B. Foster, III, MD
Thomas W. Lebert, II, MD
Richard R. Little, MD
Donald S. McLeod, MD
Stanley R. Mogelnicki, MD
Anthony Schinelli, MD
Steven L. Sween, MD
Philip H. Wells, MD
Frederick P. Yilling, MD

**EXHIBIT "2"**

000002

AGREEMENT FOR SERVICES

(PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT, INC.)

| SECTION | | PAGE |
|---|---|---|
| 1. | Engagement | 1 |
| 2. | Payment | 2 |
| 3. | Furnishings and Equipment | 4 |
| 4. | Duly Licensed | 4 |
| 5. | Term | 4 |
| 6. | Insurance | 4 |
| 7. | Relationship | 5 |
| 8. | No Surgery | 5 |
| 9. | Termination of Agreement | 6 |
| 10. | Indemnification | 6 |
| 11. | Guaranty | 6 |
| 12. | Survival | 6 |
| 13. | No Assignments; Successors | 7 |
| 14. | Headings | 7 |
| 15. | Notices | 7 |
| 16. | Governing Law | 7 |
| 17. | Severability | 8 |
| 18. | Amendment and Termination of Agreement | 8 |

133/FLF

**EXHIBIT "3"**

G00093

533/FLF

## AGREEMENT FOR SERVICES
## (PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT, INC.)


THIS AGREEMENT FOR SERVICES ("Agreement") is made and
entered into this _5_ day of _April_____, 1993, effective the 1st
day of May, 1993 (the "Effective Date"), by and between THE
RESURGENS CENTER, INC., a Georgia corporation ("Corporation") and
PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT, INC., a Georgia
corporation ("PSPM") and PHYSICIAN SPECIALISTS IN ANESTHESIOLOGY,
P.C., a Georgia professional corporation ("PSA").


### W I T N E S S E T H:


WHEREAS, PSA is a medical practice specializing in
anesthesia, critical care and pain management (such services are
hereinafter referred to as "Services"); and

WHEREAS, the Corporation leases certain medical office
space ("Premises") pursuant to the terms of that certain Medical
Office Lease dated March 27, 1991 by and between Saint Joseph's
Physician Office Partnership, L.P. and the Corporation ("Lease"); and

WHEREAS, the Corporation desires to engage PSPM to provide
Services on the Premises and PSPM desires to provide such Services
to the Corporation;

NOW, THEREFORE, for and in consideration of the mutual
covenants, promises and agreements herein contained and for other
good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the parties agree as follows:

1.   **Engagement**.  PSPM agrees to provide Services to the
Corporation within the following parameters:

A.   **Surgical Suite**.  Except as hereinafter provided,
PSPM will have the right to the exclusive use of one of the
Corporation's surgical suites (without equipment) ("Surgical Suite")
on a priority use basis for non-surgical procedures only performed
in connection with the Services.  The Corporation will permit PSPM
to have the right to exclusive use of such Surgical Suite for
non-surgical procedures until such time as the Corporation
determines it needs ongoing and regular access to such space subject
to PSPM's right to use such Surgical Suite in accordance with the
following provisions.  The Corporation agrees to give PSPM
forty-five (45) days advance written notice of its need to

access the Surgical Suite.  After PSPM receives notice from the
Corporation, PSPM will have first priority to schedule in any given
week four (4) one-half (1/2) days and agrees to give notice to the
Corporation of which days it selects in any particular week at least
one-month in advance.  PSPM's use of such Surgical Suite will not
exceed at any time forty percent (40%) of available time during
normal hours of operation, as determined on a weekly basis.  The
term "normal hours of operation" will mean the operating hours of
7:00 am to 4:00 pm, Monday through Friday, excluding holidays.

    B.   **Exam/Procedure Room**.  PSPM will have the
exclusive use of one exam/procedure room ("Exam Room") designated by
the Corporation.

    C.   **Common Areas**.  PSPM will have the right to use
the common areas in connection with its use of the Surgical Suite
and Exam Room as outlined in Paragraphs A and B above.  The common
areas for purposes hereof shall mean all areas used by the
Corporation under the Lease other than the remaining two (2)
surgical suites used exclusively by the Corporation.  PSPM agrees
that its use of such common area space will not unreasonably
interfere with the Corporation's use of such space.

    D.   **Billing**.  PSPM agrees to bill the patients for
which they provide Services, both for their professional fees and
for any facility fees due the Corporation for the use of the
Surgical Suite and Exam Room ("facility fee").  PSPM as billing
agent for the Corporation for the facility fee will cause such
facility fee to be remitted directly to the Corporation.  PSPM
agrees that all facility fees billed its patients on behalf of the
Corporation will be billed at the Corporation's standard facility
fee rate.

    2.   **Payment**.

    A.   **Calculation of Fees to PSPM**.  In consideration of
PSPM's agreement to provide Services to the Corporation, the
Corporation agrees to pay to PSPM the following amounts:  (i) PSPM's
cost of its non-physician staff to provide the Services, plus ten
percent (10%) of such amount; (ii) fifteen percent (15%) of the
total facility fees billed by PSPM for the Services to reimburse
PSPM for the cost of collecting such fees; (iii) three percent (3%)
per month for the cost of equipment provided by PSPM to provide the
Services including, without limitation, business office computers,
signage, and additional seating for patients if necessary; (iv) the
cost to PSPM of office supplies, direct expenses and medical
supplies used by PSPM in providing the Services; and (v) such
consulting fees mutually agreed to by PSPM and the Corporation for
services provided by PSPM to the Corporation.  Examples of such
expenses in (iv) above include medical records, arm bands, waste
management disposal, costs of transcription services and other
administrative services, sterile gloves, pharmaceuticals, instrument

trays, linens, and other medical disposable supplies.  The
Corporation will promptly pay such amounts to PSPM monthly in
arrears after receipt of an invoice from PSPM.

B.    Notwithstanding Paragraph A above, the
Corporation's payment to PSPM will never exceed the lesser of (i)
the amount determined under Paragraph A above or (ii) for any
particular month hereunder the difference between (a) the total
facility fees collected by the Corporation for Services performed by
PSPM for such month less (b) the sum of the amounts calculated in
(A) through (E) below for such month.

(A)  Base Amount.  The following base amount will
be effective for each month beginning on the Effective Date:

| Period | Amount |
|---|---|
| 5/01/93 – 9/30/93 | $12,022 |
| 10/1/93 – 9/30/94 | 12,420 |
| 10/1/94 – 9/30/95 | 12,818 |
| 10/1/95 – 9/30/96 | 13,614 |
| 10/1/96 – 9/30/97 | 14,012 |
| 10/1/97 – 2/28/98 | 14,410 |

(B)  Leasehold Improvements and Equipment
Rental.  Seven Hundred Dollars ($750.00) per month will be effective
on the first day of each month beginning on the Effective Date for
PSPM's right to use the furniture, fixtures and equipment located in
the space outlined in Section 1 above.  The parties agree that
PSPM's use of the Corporation's sterilizer and washer/disinfector
surgical supply area will be insignificant.  If PSPM's use of such
equipment and area increases, then the parties agree to make the
appropriate adjustments to the $750 monthly rental amount set forth
herein.

(C)  Office and Medical Expenses.  PSPM will be
charged with a prorata share of the Corporation's cost for office
supplies and direct expenses and medical supplies needed by PSPM for
each case of PSPM's.  A description of such expenses is set forth in
Section 2.A above.

(D)  Pass Through Expenses.  PSPM will be charged
with (i) all operating expenses assessed directly against the
Corporation under its Lease which are directly attributable to
PSPM's use of the space outlined in Section 1 above after the
Corporation's normal working hours, plus (ii) thirty percent (30%)
of all pass through expenses under the Lease which are not directly
attributable to PSPM's use of such space but from which PSPM
receives a material benefit.

000086

(E)  <u>Repairs and Maintenance</u>.  PSPM will be charged with the cost to either repair or replace any of the Corporation's equipment which it damages as a result of its use of the space outlined in Section 1 above.

If the difference between (ii)(a) and (ii)(b) under this Section 2.B is negative for any particular month hereunder, then PSPM agrees to reimburse the Corporation such difference promptly after receipt from the Corporation of notice of the amount thereof.

3.  <u>Furnishings and Equipment</u>.  PSPM and PSA will be responsible for providing all equipment needed in the priority reserve Surgical Suite and dedicated Exam Room, plus any other special equipment desired for the common areas, including, without limitation, business office computers, signage, additional seating for patients or other necessary equipment.  The Corporation will have the right to use PSPM's or PSA's C-Arm X-ray unit when it is not scheduled for use by PSPM or PSA.  The Corporation agrees to pay to PSPM a mutually agreeable charge per use of such C-Arm.  PSPM and PSA agree that all new improvements, furniture and signage will require the prior approval of the Corporation, which approval will not be unreasonably withheld.

4.  <u>Duly Licensed</u>.  PSPM and PSA represent to the Corporation that all of their physicians are properly licensed to practice medicine in the State of Georgia and that such physicians will remain members in good standing of the Medical Association of Georgia at all times during the term hereof.  PSPM and PSA warrant that each of its physicians providing services hereunder shall comply with all applicable laws and regulations governing the licensing and conduct of physicians and with the ethical standards of the medical profession.

5.  <u>Term</u>.  The term of this Agreement will be for three (3) years beginning as of the Effective Date, and terminating on the third anniversary of the Effective Date, unless sooner terminated as provided herein.  The parties may by an amendment hereto extend the term hereof.

6.  <u>Insurance</u>.  PSPM and PSA shall obtain and maintain throughout the term of this Agreement (i) general liability insurance of no less than $2,000,000 in the aggregate pursuant to which the Corporation shall be named as an additional insured and (ii) professional liability (malpractice) insurance coverage for PSPM, PSA and each physician performing services hereunder of at least One Million ($1,000,000.00) per occurrence and Three Million $3,000,000.00) annual aggregate.  PSPM and PSA shall, prior to providing any professional services under this Agreement in the space, provide the Corporation with a Certificate of Insurance

000007

ITLF

evidencing satisfaction of such insurance requirements. PSPM and PSA will give the Corporation thirty (30) days prior written notice of any cancellation or termination of such insurance policies, or the removal from coverage of PSPM, PSA or any physician of PSPM or PSA.

      7.   **Relationship**.  This Agreement relates solely to PSPM's agreement to provide Services to the Corporation as an independent contractor and in connection therewith, the parties acknowledge the following:

      A.   **No Control**.  The parties agree that the operations of the Corporation and the medical practice of PSPM, PSA and their physicians are in no way related.  The Corporation will have no control over the method or means in which Services are provided herein by PSPM.

      B.   **No Holding Out**.  No physician of PSPM or PSA shall hold himself out to be or represent to anyone that he is an employee of or in any way affiliated with the Corporation. Likewise, no employee of the Corporation shall hold himself out or represent to anyone that he is an employee of or in any way affiliated with PSPM or PSA.

      C.   **Separate Practice**.  PSA will maintain its own practice separate and independent from that of the Corporation.  PSA will be responsible for hiring, compensating and providing benefits to its own employees including nurses, receptionist, practice manager, and any other related medical or office staff.  PSA shall answer all their calls and schedule appointments and cases.  PSA understands and agrees that it will be responsible for securing and paying for all of their own operating expenses, including without limitation, telephone lines and equipment, telephone answering services, business licenses, legal fees, consulting fees, insurance, stationery and other office supplies, transcription services, and storage fees.  PSPM and PSA will be responsible for billing for their professional services.

      D.   **Approval**.  PSPM and PSA represent and warrant to the Corporation (i) that Saint Joseph's Hospital of Atlanta has approved of PSPM's and PSA's providing the Services contemplated hereunder and (ii) that this Agreement will not cause either PSPM or PSA to be in default of any of their respective agreements, contracts, or other obligations.

      8.   **No Surgery**.  PSPM and PSA acknowledge that neither corporation nor any of its physicians will have the right to perform ambulatory surgery in the Resurgens Surgery Center under this Agreement.

000008

9.   <u>Termination of Agreement</u>.

A.   At anytime on or after the one year anniversary date of this Agreement, either PSPM or the Corporation shall have the right to terminate this Agreement upon ninety (90) days written notice to the other party.

B.   The Corporation shall have the right to terminate this Agreement immediately and without notice: if any physician of PSPM or PSA (i) is suspended from the practice of medicine by the proper authority of the State of Georgia; (ii) shall commit a felony or other act involving moral turpitude; (iii) shall engage in drug or alcohol abuse; or (iv) shall engage in any other acts or omissions which are materially harmful to the Corporation. The failure of the Corporation to terminate this Agreement as a result of any of the foregoing at any one or more times shall not affect the Corporation's ability to terminate this Agreement as a result of the subsequent occurrence of any of the foregoing.

C.   Either the Corporation or PSPM shall have the right to terminate this Agreement immediately and without notice: if the other party materially breaches or is in default under any provision of this Agreement, which breach or default is not cured within ten (10) days after written notice thereof is given to such breaching party, provided that such breach or default is reasonably curable within such ten (10) day period and the breaching party pursues the cure of such breach or default with reasonable diligence.

10.   <u>Indemnification</u>. PSPM and PSA agree to jointly and severally indemnify and hold the Corporation harmless, both during and after the term of this Agreement, from any expense or liability incurred by the Corporation as a result of a judgment or settlement of a malpractice claim against and attributable to PSPM or PSA or any shareholder of either corporation. The Corporation shall give PSPM and PSA notice as soon as practical of any claim made against it and shall allow PSPM and PSA to participate in the defense and/or settlement of said claim provided that the Corporation retains control thereof.

The Corporation agrees to indemnify and hold PSPM and PSA harmless, both during and after the term of this Agreement, from any expense or liability incurred by PSPM or PSA as a result of a judgment or settlement of a malpractice claim against and attributable to the Corporation or any shareholder of the Corporation. PSPM and PSA shall give the Corporation notice as soon as practical of any claim made against it and shall allow the Corporation to participate in the defense and/or settlement of said claim provided that PSPM and PSA retain control thereof.

11. <u>Guaranty</u>. PSA is made a party to this Agreement to acknowledge its agreement with the provisions hereof and to guaranty

000009

33/FLF

to the Corporation the full payment of PSPM's monetary obligations
under this Agreement, including PSPM's obligations under Section 2
hereof. In such respect, PSA shall be treated as if it were an
original party to this Agreement.

12. **Survival**. No termination of this Agreement shall
affect (a) any rights or liabilities that arose or occurred prior to
the date of termination or (b) any obligations that by their terms
or nature must extend beyond the date of termination to be effective.

13. **No Assignment; Successors**. PSPM shall not assign this
Agreement or any rights hereunder without the prior written consent
of the Corporation. An aggregate change in ownership of either PSPM
or PSA of fifty percent (50%) or more shall be treated as an
assignment for purposes hereof. This Agreement shall be binding
upon and shall enure to the benefit of the parties, and any
permitted successors and assigns.

14. **Headings**. The headings of the various paragraphs of
this Agreement are for purposes of reference only, and shall not
expand, limit or otherwise affect any of the terms or provisions
hereof.

15. **Notices**. Any notice required or permitted hereunder
shall be effective on the day on which personally delivered to any
party and, if sent by registered or certified mail, return receipt
requested, such notice shall be deemed to have been delivered to the
party to whom such notice was addressed on the third (3rd) business
day after the day on which mailed to such party at the following
address or other address given in a notice to the other party:

|  |  |
|---|---|
| PSPM or PSA: | 5667 Peachtree Dunwoody Road<br>Suite 240<br>Atlanta, Georgia  30342 |
| Corporation: | The Resurgens Center, Inc.<br>Suite 800<br>5671 Peachtree Dunwoody Road<br>Atlanta, Georgia  30342 |
| With a<br>copy to: | Frances L. Faddis, Esq.<br>Altman, Kritzer & Levick, P.C.<br>Suite 224<br>6400 Powers Ferry Road, N.W.<br>Atlanta, Georgia 30339 |

16. **Governing Law**. This Agreement and the rights and
obligations of the parties hereunder shall be governed by, and
construed and interpreted in accordance with, the laws of the State
of Georgia.

000010

17. **Severability**.  If any part or portions hereof shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other term of this Agreement shall in any way be affected thereby.

18. **Amendment and Termination of Agreement**.  This Agreement may be modified only by a writing signed by the Corporation, PSPM and PSA.

**IN WITNESS WHEREOF**, the parties have set their hands and seals on the day and year first above written.

THE RESURGENS CENTER, INC., a
Georgia corporation

By _____
   JOHN C. GARRETT, President

Attest: _____
        KEITH OSBORN, Secretary

(CORPORATE SEAL)

PHYSICIAN SPECIALISTS IN PAIN
MANAGEMENT, INC., a Georgia
corporation

By _____
Name: Charles A. McNeil Jr. MD
Title: Vice President - Medical Director

Attest: _____
Name: John G. Negrete III
Title: Secretary

(CORPORATE SEAL)

(SIGNATURES CONTINUED ON NEXT PAGE)

000011

33/FLF

(SIGNATURES CONTINUED FROM PREVIOUS PAGE)

PHYSICIAN SPECIALISTS IN
ANESTHESIOLOGY, P.C., a Georgia
professional corporation

By: _____
Name: RANDY IZ.ZOTE
Title: PRESIDENT

Attest: _____
Name: RICK FOSTER
Title: SEC-TRES.

(CORPORATE SEAL)

000012

33/FLF

## BILLING AGENT AGREEMENT

THIS AGREEMENT is dated _May 1_, 1993 by and between Physician Specialists in Pain Management, Inc. ("PSPM"), and Physician Specialists in Anesthesia, P.C. ("PSA").

**WHEREAS,** the Resurgens Surgery Center is a licensed surgery center, has a Certificate of Need, has a license to transact business as a surgery center in the State of Georgia, and is therefore entitled and/or enabled to bill a charge for the use of its facility; and

**WHEREAS,** PSPM leases space from Resurgens Surgery Center; and

**WHEREAS,** PSPM bills Resurgens Surgery Center for acting as the billing agent for Resurgens Surgery Center; and

**WHEREAS,** PSPM is not able to collect the facility fee from Resurgens Surgery Center;

**THEREFORE,** the parties agree pursuant to this Agreement that PSA shall act as the billing agent for PSPM for said facility fees and PSA shall charge PSPM eight percent (8%) of all facility fee revenues which it collects for said service.

1.   **Term.**  The term of this Agreement shall begin on May 1, 1993 and shall be continuous.  Either party may terminate for any reason with sixty (60) days written notice to the other party.

**EXHIBIT "4"**

G000015

2.   **Choice of Law**.  Any controversy or claim arising out of or relating to this Agreement or its breach shall be governed in accordance with the laws of the State of Georgia.

3.   **Notices**.  Any notice required or desired to be given under this Agreement shall be deemed given if in writing sent by certified mail to PSA at 5665 Peachtree Dunwoody Road, N.E., Atlanta, Georgia 30342-1701 or to PSPM's principal office of 5667 Peachtree Dunwoody Road, Suite 240, Atlanta, Georgia  30342.

4.   **Assignment**.  The parties agree that the services outlined pursuant to this Agreement are unique.  Accordingly, neither party may assign its rights or benefits or delegate its duties or obligations under this Agreement.

5.   **Entire Agreement**.  This Agreement contains the entire understanding of the parties.  It may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

6.   **Headings**.  Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

- 2 -

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year first above written.

PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.

By: _____
President

(CORPORATE SEAL)
ATTEST:

_____ MD

PHYSICIAN SPECIALISTS IN
PAIN MANAGEMENT, INC.

By: _____
President

(CORPORATE SEAL)
ATTEST:

_____

pvh\docs\pain2.com

- 3 -

000015

## CONTRACT LABOR AGREEMENT

THIS AGREEMENT is dated May 1, 1993 by and between Physician Specialists in Pain Management, Inc. ("Employer"), and Physician Specialists in Anesthesia, P.C. ("PSA").

1.   **Employment**.   Employer shall employ the clinical employees, nurse employees, and/or administrative employees of PSA upon the terms and conditions of this Agreement.

2.   **Term**.   The term of this Agreement shall begin on May 1, 1993 and shall terminate on December 31, 1999.

3.   **Compensation**.   PSA employees will be paid by PSA. The sum paid to PSA by Employer shall be reimbursement to PSA for the cost of salaries, fringe benefits, and any other expenses shown by PSA's periodic presentation of an itemized account of such expenditures to Employer.

4.   **Duties**.   PSA employees shall perform the contract labor described herein at Employer's discretion in the capacity of administrative/office work, transcriptionists, part-time and full-time nursing, and in other capacities as so directed by Employer.

5.   **Extent of Services**.   PSA employees shall devote their entire time and attention to the Employer's business. PSA employees shall perform contract labor services at the total discretion and behest of Employer. PSA shall maintain all health and disability insurance, and workers' compensation benefits for the PSA contract labor employees who shall work on behalf of Employer pursuant to this Agreement.

**EXHIBIT "5"**

000028

6.   **Working Facilities**.   PSA employees working for Employer under this Agreement shall be located physically at the offices of Employer on a full-time basis.

7.   **Vacations**.   PSA employees shall be entitled each year to paid holidays and vacation periods similar to that received by PSA employees.

8.   **Illness or Incapacity**.   If any PSA employee working for Employer pursuant to this Agreement is unable to perform his or her services by reason of illness or incapacity for a period of more than two (2) consecutive weeks, it shall be within Employer's discretion to not reimburse PSA for payment to him/her during the continued period of such illness or incapacity and to have that employee replaced by PSA.

9.   **Termination Without Cause**.   Employer may without cause terminate this Agreement at any time by giving sixty (60) days written notice to PSA.   In that event, the PSA employees, if requested by the Employer, shall continue to render their services and shall be paid their regular compensation up to the date of termination.   PSA may without cause terminate this Agreement by giving sixty (60) days written notice to the Employer.   In such event, PSA employees shall continue to render their services and shall be paid their regular compensation up to the date of termination.   If either PSA or Employer terminates this Agreement, PSA employees shall not receive any severance payment.

10.   **Termination Upon Sale of Business**.   Notwithstanding anything to the contrary, Employer may terminate this Agreement by

000017

giving sixty (60) days notice to PSA if any of the following events occur:

      a.    The Employer sells substantially all of its assets to a single purchaser or to a group of associated purchasers;

      b.    At least two-thirds (⅔) of the outstanding corporate shares of the Employer are sold, exchanged, or otherwise disposed of in one transaction;

      c.    The Employer elects to terminate its business or liquidate its assets; or

      d.    There is a merger or consolidation of the Employer in a transaction which the Employer's shareholders receive less than fifty percent (50%) of the outstanding voting shares of the new or continuing corporation.

11.  **Choice of Law**. Any controversy or claim arising out of or relating to this Agreement or its breach shall be governed in accordance with the laws of the State of Georgia.

12.  **Notices**. Any notice required or desired to be given under this Agreement shall be deemed given if in writing sent by certified mail to PSA at 5665 Peachtree Dunwoody Road, N.E., Atlanta, Georgia 30342-1701 or to the Employer's principal office of 5667 Peachtree Dunwoody Road, Suite 240, Atlanta, Georgia 30342.

13.  **Assignment**. Employer acknowledges that the contract labor services it is receiving from PSA pursuant to this Agreement

- 3 -

G00016

are unique.  Accordingly, Employer may not assign its rights or benefits or delegate its duties or obligations under this Agreement.

14.  **Entire Agreement**.  This Agreement contains the entire understanding of the parties.  It may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

15.  **Headings**.  Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year first above written.

PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.

By: _____
                              President

(CORPORATE SEAL)
ATTEST:

_____

PHYSICIAN SPECIALISTS IN
PAIN MANAGEMENT, INC.

By: _____
                              President

(CORPORATE SEAL)
ATTEST:

_____

pvb\docs\pain.con

- 4 -

## AGREEMENT

**THIS AGREEMENT** is made this the twelfth day of July, 1993 by and between **RESURGENS SURGERY CENTER** ("Resurgens Surgery Center") and **PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.** ("PSA") and **PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT** ("PSPM").

**FOR AND IN CONSIDERATION** of One Dollar ($1.00) in hand paid by PSA and PSPM to Resurgens Surgery Center, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the parties hereto, the parties agree as follows:

(1)     Resurgens Surgery Center hereby agrees to indemnify and hold harmless PSA, its present, former and future directors, officers, employees, and agents, and their heirs, executors, successors, and assigns from any liability, expenses, costs, damages, attorneys fees, and losses of any kind arising out of injuries to any person or persons or damages to any property of any kind in connection with the use of the following medical equipment.

(a)     C-Arm 9400, Esp 9;

(b)     Printer, Thermal Imaging

(2)     Resurgens Surgery Center hereby agrees to indemnify and hold harmless PSPM, its present, former and future directors, officers, employees, and agents, and their heirs, executors, successors, and assigns from any liability, expenses, costs, damages, attorneys fee, and losses of any kind arising out of injuries to any person or persons or damages to any property of any kind in connection with the use of the following medical equipment.

(Hereinafter the "Equipment")

(3)     The Equipment is property of PSPM and shall be returned and/or turned over to PSPM upon demand.

**IN WITNESS WHEREOF** the parties have set their hands and affixed their seal the date first above written.


RESURGENS SURGERY CENTER          PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.


_____          _____
Y:                                       BY:
TS:                                      ITS:



HYSICIAN SPECIALISTS IN PAIN MANAGEMENT


                                         **EXHIBIT "6"**
_____
Y:
S:                                                          0000~0

SUPPLEMENT

TO

AGREEMENT FOR SERVICES

(PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT, INC.)


THIS SUPPLEMENT TO AGREEMENT FOR SERVICES ("Supplement") is made and entered into this __1__ day of __October__, 1993, by and between THE RESURGENS CENTER, INC., a Georgia corporation ("Corporation") and PHYSICIAN SPECIALISTS IN PAIN MANAGEMENT, INC., a Georgia corporation ("PSPM") and PHYSICIAN SPECIALISTS IN ANESTHESIOLOGY, P.C., a Georgia professional corporation ("PSA").


W I T N E S S E T H:


WHEREAS, the parties entered into that certain Agreement for Services ("Agreement") dated April 5, 1993, effective May 1, 1993; and

WHEREAS, the parties desire to supplement such Agreement in accordance with the terms hereof;

NOW THEREFORE, for and in consideration of the mutual covenants, promises and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   <u>C-Arm X-ray Unit</u>.  The parties agree that in accordance with Section 3 of the Agreement, the Corporation will have the right to use PSPM's or PSA's C-Arm X-ray Unit for one-half (1/2) day per week in consideration for the Corporation's payment to PSPM or PSA of $250.00 for each such one-half (1/2) day.  The parties acknowledge that such one-half (1/2) day is currently scheduled to be Wednesday mornings from 7:00 a.m. through noon. Unless the parties mutually agree to any additional one-half (1/2) days, any additional use by the Corporation (including any use by the Corporation on an emergency basis) will cost $190.00 per hour (prorated for any partial hour after the first hour) provided that such C-Arm X-ray Unit is available and not then being used by PSPM or PSA.  Notwithstanding the foregoing, the Corporation will have the right for any particular one-half (1/2) day session to cancel its right to use such X-ray Unit and thereby avoid the cost thereof, provided that the Corporation gives PSA at least two (2) weeks advance written notice of such cancellation.

2.   <u>Binding Agreement</u>.  The Agreement, together with this Supplement, is binding on the parties hereto.

**EXHIBIT "7"**

G00021

**IN WITNESS WHEREOF**, the parties have set their hands and seals on the day and year first above written.

THE RESURGENS CENTER, INC., a
Georgia corporation

By: _____
     JOHN C. GARRETT, President

Attest: _____
        KEITH OSBORN, Secretary

(CORPORATE SEAL)


PHYSICIAN SPECIALISTS IN PAIN
MANAGEMENT, INC., a Georgia
corporation

By: _____
Name: _____
Title: _____

Attest: _____
Name: Russell J Rizov
Title: Adminstrat

(CORPORATE SEAL)


PHYSICIAN SPECIALISTS IN
ANESTHESIOLOGY, P.C., a Georgia
professional corporation

By: _____
Name: Rex A Foster III
Title: President

Attest: _____
Name: Russell J Rizov
Title: Adminstrat

(CORPORATE SEAL)

000022

732FLF

# Physician Specialists In Anesthesia, P.C.

## Third Quarter Report

### January 1 - September 30, 1996

Shareholder's Quarterly Reports

**EXHIBIT "8"**

# Physician Specialists In Anesthesia
## Practice Statistics - Third Quarter Report

## Physician Specialists In Anesthesia

| Summary | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Charges | 1,988,676 | 1,819,864 | 1,860,408 | 1,941,531 | 1,917,469 | 1,765,872 | 2,027,890 | 2,027,164 | 1,978,229 | 17,325,103 | 1,925,011 |
| Gross Receipts | 1,067,198 | 892,342 | 1,235,532 | 1,203,811 | 1,132,806 | 922,614 | 1,127,000 | 1,231,812 | 1,323,450 | 10,236,565 | 1,137,396 |

## Gross Charges by Location

| Location | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Saint Joseph's | 1,572,118 | 1,460,020 | 1,462,614 | 1,459,700 | 1,436,642 | 1,306,951 | 1,483,877 | 1,506,045 | 1,470,818 | 13,158,783 | 1,462,087 |
| Parkway | 171,827 | 183,867 | 160,626 | 175,857 | 166,302 | 161,412 | 209,741 | 203,588 | 196,329 | 1,609,548 | 178,839 |
| Pain Center | 115,664 | 89,850 | 111,874 | 165,265 | 158,005 | 164,078 | 169,654 | 164,780 | 143,689 | 1,282,859 | 142,540 |
| Resurgens | 84,131 | 66,577 | 86,194 | 89,649 | 93,657 | 73,229 | 102,219 | 93,201 | 107,043 | 797,901 | 88,656 |
| Urology | 42,936 | 37,550 | 39,100 | 51,060 | 62,864 | 60,202 | 62,400 | 59,550 | 60,350 | 476,012 | 52,880 |
| Total | 1,986,676 | 1,819,864 | 1,860,408 | 1,941,531 | 1,917,469 | 1,765,872 | 2,027,890 | 2,027,164 | 1,978,229 | 17,325,103 | 1,925,011 |

## Gross Receipts by Location

| Location | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Saint Joseph's | 804,783 | 763,103 | 904,234 | 892,159 | 794,977 | 663,762 | 814,516 | 811,274 | 845,018 | 7,493,807 | 832,645 |
| Parkway | 109,764 | 93,504 | 127,744 | 117,815 | 124,069 | 89,565 | 98,842 | 87,717 | 126,935 | 985,955 | 109,551 |
| Pain Center | 76,220 | 61,273 | 92,953 | 87,118 | 118,363 | 79,062 | 119,435 | 136,321 | 120,561 | 891,306 | 99,034 |
| Resurgens | 61,285 | 70,500 | 62,209 | 68,116 | 67,310 | 53,423 | 60,442 | 63,867 | 84,112 | 591,265 | 65,696 |
| Urology | 15,166 | 3,961 | 48,392 | 38,603 | 28,086 | 26,802 | 33,765 | 32,633 | 46,824 | 274,232 | 30,470 |
| Total | 1,067,198 | 892,342 | 1,235,532 | 1,203,811 | 1,132,806 | 922,614 | 1,127,000 | 1,231,812 | 1,323,450 | 10,236,565 | 1,137,396 |

000024

**Physician Specialists In Anesthesia**
**Practice Statistics - Third Quarter Report**

**Quarterly Gross Charges by Location**

| Location | 1st Qtr | 2nd Qtr | 3rd Qtr | YTD | | 1st Qtr | 2nd Qtr | 3rd Qtr | YTD |
|---|---|---|---|---|---|---|---|---|---|
| Saint Joseph's | 4,494,751 | 4,203,292 | 4,460,740 | 13,158,783 | | 79.3% | 74.7% | 73.9% | 76.0% |
| Parkway | 496,319 | 503,578 | 609,657 | 1,609,554 | | 8.8% | 9.0% | 10.1% | 8.3% |
| Pain Center | 317,388 | 487,348 | 478,123 | 1,282,859 | | 5.6% | 8.7% | 7.9% | 7.4% |
| Resurgens | 238,903 | 256,535 | 302,463 | 797,901 | | 4.2% | 4.6% | 5.0% | 4.6% |
| Urology | 119,586 | 174,126 | 182,300 | 476,012 | | 2.1% | 3.1% | 3.0% | 2.7% |
| Total | 5,666,947 | 5,624,879 | 6,033,283 | 17,325,109 | | 100.0% | 100.0% | 100.0% | 100.0% |

**Quarterly Gross Receipts by Location**

| Location | 1st Qtr | 2nd Qtr | 3rd Qtr | YTD | | 1st Qtr | 2nd Qtr | 3rd Qtr | YTD |
|---|---|---|---|---|---|---|---|---|---|
| Saint Joseph's | 2,472,100 | 2,350,889 | 2,670,808 | 7,493,807 | | 43.6% | 41.8% | 44.3% | 43.3% |
| Parkway | 328,991 | 341,835 | 313,414 | 984,239 | | 5.8% | 6.1% | 5.2% | 5.7% |
| Pain Center | 230,446 | 284,543 | 376,317 | 891,306 | | 4.1% | 5.1% | 6.2% | 5.1% |
| Resurgens | 193,994 | 188,849 | 208,421 | 591,265 | | 3.4% | 3.4% | 3.5% | 3.4% |
| Urology | 67,519 | 93,491 | 113,222 | 274,232 | | 1.2% | 1.7% | 1.9% | 1.6% |
| Total | 3,293,050 | 3,259,617 | 3,682,182 | 10,234,849 | | 58.1% | 57.9% | 61.0% | 58.1% |

# Physician Specialists In Anesthesia
## Practice Statistics - Third Quarter Report

### Saint Joseph's Hospital

| Summary | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Charges | 1,572,118 | 1,460,020 | 1,462,614 | 1,459,700 | 1,436,642 | 1,306,951 | 1,483,877 | 1,506,045 | 1,470,818 | 13,158,783 |
| Gross Receipts | 804,763 | 763,103 | 904,234 | 892,159 | 794,977 | 663,762 | 814,516 | 911,274 | 945,018 | 7,493,806 |

| Accounts Receivable (1) | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|
| Current A/R | 2,429,159 | 2,784,939 | 2,826,579 | 2,841,018 | 2,885,672 | 3,165,221 | 3,165,756 | 3,199,508 | 3,318,894 | 2,957,20 |
| Days In A/R | 46.5 | 54.0 | 54.5 | 56.0 | 56.9 | 64.7 | 64.2 | 63.9 | 63.5 | 58.2 |
| Percent A/R Over 90 Days | 0.6 | 4.1 | 12.5 | 17.6 | 23.4 | 26.0 | 25.8 | 26.5 | 25.2 | |

| Case Statistics | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number Cases | 1,336 | 1,235 | 1,215 | 1,285 | 1,238 | 1,175 | 1,243 | 1,277 | 1,266 | 11,270 | 1,252 |
| Avg Charge Per Case | 1,177 | 1,182 | 1,204 | 1,136 | 1,160 | 1,112 | 1,194 | 1,179 | 1,162 | | 1,167 |

(1) Includes A/R for Resurgens Surgical Center

000028

**Physician Specialists In Anesthesia**
**Practice Statistics - Third Quarter Report**

## Urology - AOSS

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Charges | 42,936 | 37,550 | 39,100 | 51,060 | 62,864 | 60,202 | 62,400 | 59,550 | 60,350 | 476,012 | 52,890 |
| Gross Receipts | 15,166 | 3,961 | 48,392 | 38,603 | 28,086 | 26,802 | 33,765 | 32,633 | 46,824 | 274,232 | 30,470 |

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases | 101 | 91 | 87 | 111 | 130 | 127 | 131 | 140 | 130 | 1,048 | 116 |
| Avg Charge Per Case | 425 | 413 | 449 | 460 | 484 | 474 | 476 | 425 | 464 | | 454 |
| Avg Receipts Per Case | 150 | 44 | 556 | 348 | 216 | 211 | 258 | 233 | 360 | | 262 |

## Resurgens Surgery Center

| Summary | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Charges | 84,131 | 88,577 | 86,194 | 89,649 | 93,657 | 73,229 | 102,219 | 83,201 | 107,043 | 797,901 | 88,656 |
| Gross Receipts | 61,285 | 70,500 | 62,209 | 68,116 | 67,310 | 53,423 | 60,442 | 63,867 | 84,112 | 591,265 | 65,696 |

| Case Statistics | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases | 108 | 125 | 147 | 116 | 146 | 124 | 134 | 156 | 156 | 1,212 | 135 |
| Avg Charge Per Case | 779 | 549 | 586 | 773 | 641 | 591 | 763 | 597 | 686 | | 858 |
| Avg Receipts Per Case | 567 | 564 | 423 | 587 | 461 | 431 | 451 | 409 | 539 | | 488 |

000027

Physician Specialists In Anesthesia
Practice Statistics - Third Quarter Report

Physician Pain Specialists

| Summary | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Charges | 115,664 | 88,850 | 111,874 | 165,265 | 158,005 | 164,078 | 169,654 | 164,780 | 143,689 | 1,282,859 | 142,540 |
| Gross Receipts | 76,220 | 61,273 | 92,953 | 87,118 | 118,363 | 79,062 | 119,435 | 136,321 | 120,561 | 891,306 | 99,034 |

| Utilization | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Outpatients - New | 46 | 70 | 64 | 83 | 63 | 57 | 66 | 74 | 62 | 585 | 65 |
| Total Outpatients - Establ | 213 | 245 | 267 | 219 | 260 | 212 | 218 | 246 | 234 | 2,114 | 235 |
| Total Outpatients | 259 | 315 | 331 | 302 | 323 | 269 | 284 | 320 | 296 | 2,699 | 300 |
| Total Inpt. Consults | 161 | 173 | 272 | 201 | 195 | 247 | 208 | 237 | 228 | 1,922 | 214 |

000028

**Physician Specialists In Anesthesia**
**Practice Statistics - Third Quarter Report**

**Parkway Regional Medical Center**

| Summary | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Av |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Charges | 171,827 | 163,867 | 160,626 | 175,857 | 166,302 | 161,412 | 209,741 | 203,588 | 196,329 | 1,609,548 | 178,8... |
| Gross Receipts | 171,827 | 93,504 | 127,744 | 117,815 | 124,069 | 99,565 | 98,842 | 87,717 | 126,935 | 1,048,018 | 116,44... |

| Accounts Receivable | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Av |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Current A/R | 507,335 | 551,612 | 478,223 | 489,734 | 409,049 | 427,488 | 492,083 | 530,842 | 585,301 | 4,471,666 | 496,85... |
| Days In A/R | 82.8 | 97.9 | 87.9 | 89.3 | 74.2 | 77.4 | 83.5 | 84.2 | 87.5 | | 85 |
| Percent A/R Over 90 Days | 29.7 | 32.0 | 36.3 | 39.3 | 35.9 | 34.3 | 29.3 | 31.5 | 32.9 | | 33 |

| Case Statistics | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Av |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number Cases | 254 | 244 | 254 | 282 | 249 | 249 | 300 | 285 | 276 | 2,393 | 26... |
| Avg Charge Per Case | 676 | 672 | 632 | 624 | 668 | 648 | 699 | 714 | 711 | | 6... |

# Physician Specialists In Anesthesia
## Practice Statistics - Third Quarter Report

### Saint Joseph's - Gross Charges by Service Type

| Service Type | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Av |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Inpatient | 608,526 | 591,874 | 612,771 | 559,883 | 651,722 | 600,603 | 622,957 | 674,547 | 657,000 | 5,580,883 | 620,09 |
| Outpatient | 289,749 | 302,696 | 274,111 | 307,025 | 260,904 | 257,177 | 298,098 | 324,719 | 260,948 | 2,555,427 | 283,83 |
| Cardiac | 626,343 | 550,550 | 558,782 | 571,982 | 513,116 | 430,921 | 549,978 | 480,896 | 534,816 | 4,817,383 | 535,26 |
| Acute | 46,500 | 14,900 | 16,950 | 20,800 | 20,900 | 18,250 | 12,844 | 25,883 | 28,054 | 205,081 | 22,78 |
| Total | 1,572,118 | 1,460,020 | 1,462,614 | 1,459,700 | 1,436,642 | 1,306,951 | 1,483,877 | 1,506,045 | 1,470,818 | 13,158,783 | 1,462,08 |

### Parkway Regional - Gross Charges by Service Type

| Service Type | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | YTD Total | 9 Mo Av |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Inpatient | 54,906 | 49,150 | 26,434 | 37,323 | 49,134 | 58,462 | 74,265 | 63,191 | 52,751 | 465,616 | 51,73 |
| Outpatient | 66,478 | 66,317 | 88,142 | 85,754 | 68,249 | 62,401 | 87,459 | 90,158 | 83,713 | 708,670 | 78,74 |
| Acute | 750 | 2,200 | 2,800 | 750 | 1,300 | 1,850 | 3,172 | 4,836 | 1,716 | 19,374 | 2,15 |
| Chronic O/P | 11,842 | 12,550 | 12,450 | 12,240 | 16,350 | 10,550 | 12,727 | 9,852 | 6,548 | 105,109 | 11,67 |
| Chronic I/P | 0 | 1,500 | 800 | 0 | 350 | 950 | 0 | 0 | 0 | 3,600 | 40 |
| OB | 37,850 | 32,150 | 30,000 | 39,780 | 30,919 | 27,206 | 32,118 | 35,552 | 41,600 | 307,185 | 34,13 |
| Total | 171,828 | 163,867 | 160,626 | 175,857 | 168,302 | 161,419 | 209,741 | 203,588 | 188,329 | 1,609,554 | 178,83 |

G00035

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _January 1996_

I.   CODING OF RECEIPTS

A/C 1401   St. Joseph's (Monthly Audit Report attached)      _80 4 762. 83_

A/C 2401   Pain Center (Monthly Audit Report
attached)                                              _65,950.25_

A/C 4401   Resurgens (Monthly Audit Report attached)       _61,295.98_

Loans  _Urology_                                 _5,453.75_

Other  _Parkway_                                 _109,764.07_

Total Receipts Coded                                      _549 155.28_

**To be Completed by Brooks, Worsham & Company**

I.   RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded                          _____

Adjustments              _____       _____

_____       _____

Total deposits per bank statement            _____

**EXHIBIT "9"**

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _February 1996_

I.  CODING OF RECEIPTS

A/C 1401    St. Joseph's (Monthly Audit Report attached)      _763, 103. 26_

A/C 2401    Pain Center (Monthly Audit Report attached)      _59, 365, 78_

A/C 4401    Resurgens (Monthly Audit Report attached)      _70, 499, 86_

~~~~~~~ _Parkway_ _____      _93 504. 38_

~~~~ _Urology_ _____      _14, 255. 74_

Total Receipts Coded      _1,000, 729. 02_

**To be Completed by Brooks, Worsham & Company**

I.  RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded      _____

Adjustments      _____      _____

_____      _____

Total deposits per bank statement      ===============

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _March 1996_

I.   <u>CODING OF RECEIPTS</u>

A/C 1401   St. Joseph's (Monthly Audit Report attached)   _904 253.90_

A/C 2401   Pain Center (Monthly Audit Report attached)   _74,514.73_

A/C 4401   Resurgens (Monthly Audit Report attached)   _62 209.13_

~~Loans~~ _Prkway_   _127,743.66_

~~Other~~ _Urology_   _3,961.16_

Total Receipts Coded   _1,172,682.5?_

**To be Completed by Brooks, Worsham & Company**

I.   RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded   _____

Adjustments   _____   _____

_____   _____

Total deposits per bank statement   _____

000033

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _April 1996_

I.  CODING OF RECEIPTS

A/C 1401    St. Joseph's (Monthly Audit Report attached)    _892,159.01_

A/C 2401    Pain Center (Monthly Audit Report attached)    _73,549.48_

A/C 4401    Resurgens (Monthly Audit Report attached)    _68,115.82_

~~Loans~~  _Parkway_                                    _117,558.25_

~~Other~~  _See attached non-fee items_    _·72,815.27_

Total Receipts Coded                              _1,224,197.83_

**To be Completed by Brooks, Worsham & Company**

I.  RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded                    _____

Adjustments          _____        _____

                     _____        _____

Total deposits per bank statement       _____

000034

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _May 1996_

I.   <u>CODING OF RECEIPTS</u>

A/C 1401     St. Joseph's (Monthly Audit Report attached)     _794,077.79_

A/C 2401     Pain Center (Monthly Audit Report attached)     _87,197.20_

A/C 4401     Resurgens (Monthly Audit Report attached)     _47,310,32_

~~Icms~~ _Urology_     _36,491.62_

~~Other~~ _Parkway_     _124,069.29_

Total Receipts Coded     _1,109,846.52_

**To be Completed by Brooks, Worsham & Company**

I.   RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded     _____

Adjustments     _____     _____

_____     _____

Total deposits per bank statement     _____

000035

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _June 1996_

I.   CODING OF RECEIPTS

A/C 1401   St. Joseph's (Monthly Audit Report attached)   _663,762.41_

A/C 2401   Pain Center (Monthly Audit Report attached)   _62,448.07_

A/C 4401   Resurgens (Monthly Audit Report attached)   _53,423.32_

~~Loans~~ _Urology_   _26,400.36_

~~Other~~ _Parkway_   _99,564.74_

Total Receipts Coded   _905,528.92_

**To be Completed by Brooks, Worsham & Company**

I.   RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded   _____

Adjustments   _____   _____

_____   _____

Total deposits per bank statement   _____

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _July 1996_

I.   <u>CODING OF RECEIPTS</u>

A/C 1401   St. Joseph's (Monthly Audit Report attached)   _814,516.63_

A/C 2401   Pain Center (Monthly Audit Report
attached)   _92,775.48_

A/C 4401   Resurgens (Monthly Audit Report attached)   _60,442.00_

Suntrust → Loans   _Construction of Pain Center_   _120,000.00_ ✱ ✓
_Purchase of C·ARM_   _117,904.86_ ✱ ✓

Other   _Parkway Income_   _·98,842.25_
_Urology Income_   _25,193.45_ ✱

Total Receipts Coded   _Non·Fee List_   _1,329,674.72_
_+ 15,205.00_ ✱

*all are not posted
into system*

**To be Completed by Brooks, Worsham & Company**   _1,344,879.02_

I.   RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

Total Receipts Coded

Adjustments   _____   _____

_____   _____

Total deposits per bank statement

000037

**PHYSICIAN SPECIALISTS IN ANESTHESIA, P.C.**
**RECONCILIATION AND CODING OF CASH RECEIPTS**
**FOR THE MONTH OF** _August 1996_

I.    <u>CODING OF RECEIPTS</u>

|  |  |  |
|---|---|---|
| A/C 1401 | St. Joseph's (Monthly Audit Report attached) | _911,273.73_ |
| A/C 2401 | Pain Center (Monthly Audit Report attached) | _110,552.30_ |
| A/C 4401 | Resurgens (Monthly Audit Report attached) | _63,867.38_ |
|  | _Urology_ | _31,738.63_ |
|  | _Parkway_ | _87,716.67_ |
|  | Total Receipts Coded | _1,205,148.71_ |

**To be Completed by Brooks, Worsham & Company**

I.    RECONCILIATION OF RECEIPTS TO THE BANK STATEMENT

|  |  |  |
|---|---|---|
| Total Receipts Coded | _____ |
| Adjustments | _____ | _____ |
|  | _____ | _____ |
| Total deposits per bank statement | | _____ |

*Jan ?ry 1996*

# FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)

1.  DETERMINE BANKING FEES.
    CUT CHECK FROM PSPM TO MANAGED CARE.   *72.37*

2.  DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF MONTH THROUGH LAST DATE OF MONTH (FROM OPEN ITEM REPORTS , FAC AND PSA)   *12,150.16*

    EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE
             ACCOUNT

3.  EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE LAST DAY OF THE MONTH INTO PSA TO OFFSET COLLECTIONS DUE PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL PROFESSIONAL $ COLLECTED.

*13,487.17   Prof acct. total collections*

Ⓐ *Managed Care*
*balance  1/31/96  =  30,299.48*
*Bank Acct*

*< 7,879.28 >   Dec 1995 Extraction*

*22,420.20*

*< 12,150.16 >  Fac. due to PSPM*

*< 10,270.04 >  Prof. due to PSA*

*0*



*February 1996*

# FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)

1.  DETERMINE BANKING FEES.
    CUT CHECK FROM PSPM TO MANAGED CARE.    · 14 ¢

2.  DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF
    MONTH THROUGH LAST DATE OF MONTH (FROM OPEN ITEM REPORTS ,
    FAC AND PSA)      2,476.08

    EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE
             ACCOUNT

3.  EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE
    LAST DAY OF THE MONTH INTO PSA TO OFFSET COLLECTIONS DUE
    PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL
    PROFESSIONAL $ COLLECTED.

2/29 Balance  35,947.54
        〈 30, 299.48 〉
          5,648.06   End Balance for 2/96
        (2,476.08 )  Due  PSPM
        (1906.88)    Due  PSA
        ─────────
          1,265.10   Left in Managed Care acct

000040

*March 1996*

## FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)

1. DETERMINE BANKING FEES.
   CUT CHECK FROM PSPM TO MANAGED CARE.    *71.39*

2. DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF MONTH THROUGH LAST DATE OF MONTH (FROM OPEN ITEM REPORTS , FAC AND PSA)   *12,934.34*

   EQUALS: TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE ACCOUNT

3. EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE LAST DAY OF THE MONTH INTO PSA TO OFFSET COLLECTIONS DUE PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL PROFESSIONAL $ COLLECTED.

*3/30  Balance   53,120.93*
*Less Dec-Jul  <34,682.44>*
*Check Recon*
_____
*18,438.49*
① *<12,934.34># due PSPM*
_____
*5,504.15*
② *<5,504.15># due PSA*
_____
*— 0 —*

*April 1996*

**FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO
PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)**

1.  DETERMINE BANKING FEES.
    CUT CHEC FROM PSPM TO MANAGED CARE.  $106.88

2.  DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF
    MONTH THROUGH LAST DATE OF MONTH (OPEN ITEM REPORTS FAC AND
    PROF. PSA)    $13,568.67

    EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE
            ACCOUNT.

3.  EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE
    LAST DAY OF THE MONTH INTO PSA ACCOUNT TO OFFSET COLLECTIONS
    DUE TO PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL
    PROFESSIONAL MONEY $ COLLECTED.

4/30/96 Ending Collected bank balance  31,319.96
Total facility $ collected   13,568.67
Due to PSPM prior 3/1/96 facility ⟨13,568.67⟩
Due to PSA prior to 3/1/96 Prof ⟨17,751.29⟩
                              _____
                              — 0 —

note: 4/1/96  53,120.93  balance
          ⟨53,120.93⟩ Dec., Jan., Feb., March reconcilement.
          _____
                 0

000042

*May 1996*

**FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)**

1.  DETERMINE BANKING FEES.
    CUT CHEC FROM PSPM TO MANAGED CARE.  $73.01

2.  DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF
    MONTH THROUGH LAST DATE OF MONTH (OPEN ITEM REPORTS FAC AND
    PROF. PSA)
    *17,218.90*
    EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE
    ACCOUNT.

3.  EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE
    LAST DAY OF THE MONTH INTO PSA ACCOUNT TO OFFSET COLLECTIONS
    DUE TO PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL
    PROFESSIONAL MONEY $ COLLECTED.

*5/31/96 Ending Collected bank balance   31,165.39*
*Due PSPM Total facility $ collected   ( 17,218.90 )*
*Total professional $ collected ( 13,946.49 )*
*0*

G00043

*June 1996*

## FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)

1. DETERMINE BANKING FEES.
   CUT CHEC FROM PSPM TO MANAGED CARE.    $75.49

2. DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF MONTH THROUGH LAST DATE OF MONTH (OPEN ITEM REPORTS FAC AND PROF. PSA)
   $9,650.58

   EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE ACCOUNT.

3. EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE LAST DAY OF THE MONTH INTO PSA ACCOUNT TO OFFSET COLLECTIONS DUE TO PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL PROFESSIONAL MONEY $ COLLECTED.

6/30/96 Ending Collected Bank Balance  16,614.37
Due PSPM=Total facility $ Collected    (9,650.58)
Due PSA Total Professional $ Collected  (6,963.79)
                                        ─ 0 ─

000014

*July 1996*

**FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO
PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)**

1.   DETERMINE BANKING FEES.
     CUT CHEC FROM PSPM TO MANAGED CARE.     $90.34

2.   DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF
     MONTH THROUGH LAST DATE OF MONTH (OPEN ITEM REPORTS FAC AND
     PROF. PSA)
                                        12,324.76

     EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE
              ACCOUNT.

3.   EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE
     LAST DAY OF THE MONTH INTO PSA ACCOUNT TO OFFSET COLLECTIONS
     DUE TO PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL
     PROFESSIONAL MONEY $ COLLECTED.

7/30/96 Ending Collected Bank Bal.     26,659.73
Due PSPM Total facility $ collected    <12,324.76>
Due PSA Total Professinal $ Collected  <14,334.97>
                                       ————————
                                          — 0 —

*August 1996*

**FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO
PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)**

1.  DETERMINE BANKING FEES.
    CUT CHEC FROM PSPM TO MANAGED CARE.          $ 75.85

2.  DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF
    MONTH THROUGH LAST DATE OF MONTH (OPEN ITEM REPORTS FAC AND
    PROF. PSA)          $ 23,965.40

    EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE
             ACCOUNT.

3.  EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE
    LAST DAY OF THE MONTH INTO PSA ACCOUNT TO OFFSET COLLECTIONS
    DUE TO PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL
    PROFESSIONAL MONEY $ COLLECTED.

8/30/96 Ending Collected Balance     25,768.40

Due to PSPM facility $ collected    (23,965.40)

Due to PSA professional $ due        ( 1,803.00)
                                     _____
                                        — 0 —

*September 1996*

## FORMULA FOR DISTRIBUTING MANAGED CARE MONEY TO PROPER ACCOUNTS FOR A MONTHLY PERIOD (FAC AND PROF)

1. DETERMINE BANKING FEES.
   CUT CHEC FROM PSPM TO MANAGED CARE.   *$ 76.02*

2. DETERMINE TOTAL FACILITY MONEY COLLECTED FROM FIRST DATE OF MONTH THROUGH LAST DATE OF MONTH (OPEN ITEM REPORTS FAC AND PROF. PSA)

   EQUALS:  TOTAL AMOUNT DUE FACILITY FROM MANAGED CARE ACCOUNT.

3. EXTRACT FUNDS REMAINING IN MANAGED CARE ACCOUNT AS OF THE LAST DAY OF THE MONTH INTO PSA ACCOUNT TO OFFSET COLLECTIONS DUE TO PROFESSIONAL ACCOUNT.  THIS AMOUNT SHOULD EQUAL TOTAL PROFESSIONAL MONEY $ COLLECTED.

*Total      28,783.80*

**Physician Specialists in Anesthesia**
**1996 Pain Center Budget**

| | 1995 Actual | 1995 Percent | 1996 Budget | 1996 Percent |
|---|---|---|---|---|
| Revenues | | | | |
| Professional Fees | 1,097,041 | 47.4% | 900,000 | 64.3% |
| Facility Fees | 1,264,834 | 54.7% | 400,000 | 28.6% |
| Supplies Fees | 0 | 0.0% | 150,000 | 10.7% |
| Less Refunds & Returned Checks | -49,656 | -2.1% | -50,000 | -3.6% |
| Total Revenues | 2,312,219 | 100.0% | 1,400,000 | 100.0% |
| | | | | |
| Operating Expenses | | | | |
| Amortization Expenses | 3,049 | 0.1% | 3,050 | 0.2% |
| Bank Charges | 1,019 | 0.0% | 1,050 | 0.1% |
| Billing & Mgmt Expense | 104,640 | 4.5% | 70,000 | 5.0% |
| Consultants | 3,190 | 0.1% | 20,000 | 1.4% |
| Continuing Education | 5,185 | 0.2% | 6,000 | 0.4% |
| Depreciation | 35,922 | 1.6% | 36,000 | 2.6% |
| Donation | 1,100 | 0.0% | 1,000 | 0.1% |
| Drugs & Medical Supplies | 134,580 | 5.8% | 140,000 | 10.0% |
| Professional Moving Expense | 517 | 0.0% | 0 | 0.0% |
| Taxes & Licenses | 2,443 | 0.1% | 2,500 | 0.2% |
| Insurance | 2,046 | 0.1% | 2,400 | 0.2% |
| Interest Expense | 17,484 | 0.8% | 0 | 0.0% |
| Legal & Accounting | 11,202 | 0.5% | 12,000 | 0.9% |
| Meetings & Promotion | 414 | 0.0% | 1,000 | 0.1% |
| Dues & Subscriptions | 1,333 | 0.1% | 1,500 | 0.1% |
| Employee Welfare | 280 | 0.0% | 300 | 0.0% |
| Lab Expense | 392 | 0.0% | 500 | 0.0% |
| Laundry & Uniforms | 220 | 0.0% | 300 | 0.0% |
| Marketing Expense | 0 | 0.0% | 25,000 | 1.8% |
| Printing & Forms | 924 | 0.0% | 6,000 | 0.4% |
| Office Supplies & Expense | 16,981 | 0.7% | 18,000 | 1.3% |
| Parking | 5,453 | 0.2% | 5,500 | 0.4% |
| Postage | 1,894 | 0.1% | 4,000 | 0.3% |
| Relocation Expense | 0 | 0.0% | 75,000 | 5.4% |
| Rent | 165,651 | 7.2% | 77,456 | 5.5% |
| Repairs & Maintenance | 4,945 | 0.2% | 6,000 | 0.4% |
| Telephone | 11,851 | 0.5% | 12,000 | 0.9% |
| Salaries - Administration | 128,864 | 5.6% | 56,640 | 4.0% |
| Salaries - Nurses - Full Time | 135,043 | 5.8% | 138,199 | 9.9% |
| Salaries - Nurses - Part Time | 20,452 | 0.9% | 26,000 | 1.9% |
| Salaries - Technician | 28,743 | 1.2% | 21,000 | 1.5% |
| Cafeteria Plan | 0 | 0.0% | 29,148 | 2.1% |
| Pension Contribution | 14,194 | 0.6% | 7,185 | 0.5% |
| 401 - K Employee Match | 6,173 | 0.3% | 2,184 | 0.2% |
| Employer Payroll Taxes | 24,051 | 1.0% | 29,021 | 2.1% |
| Total Operating Expenses | 890,235 | 38.5% | 835,913 | 59.7% |
| | | | | |
| Net Income | 1,421,984 | 61.5% | 564,087 | 40.3% |

**EXHIBIT "10"**

000025

## Physician Pain Specialists
### Analysis of Operating and Overhead Expenses

| | Patient Volume | Total Operating Expenses | Drugs & Supplies | Office Supplies | Admin Salaries | Clinical Salaries | Total Salaries | Fringe Benefits | Overhead | ADMINISTRATIVE COSTS | | | CLINICAL COSTS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Bus Dev | Direct | Personnel | Direct | Personnel |
| **1994 Jan** | 290 | 55,023 | 5,830 | 2,090 | 7,487 | 15,203 | 22,690 | 4,660 | 16,982 | - | 4,250 | 9,025 | 6,038 | 17,630 |
| Feb | 273 | 97,407 | 14,212 | 2,227 | 7,535 | 18,552 | 26,087 | 3,916 | 22,481 | 50 | 27,875 | 8,666 | 17,018 | 16,188 |
| Mar | 280 | 64,436 | 14,929 | 221 | 7,423 | 15,071 | 22,494 | 2,934 | 16,591 | 18,881 | (11,848) | 8,391 | 15,384 | 17,268 |
| Apr | 328 | 75,299 | 18,624 | 997 | 5,073 | 14,875 | 19,948 | 2,750 | 22,881 | 1,024 | 7,643 | 5,772 | 21,053 | 16,928 |
| May | 385 | 58,405 | 9,489 | 254 | 2,671 | 15,424 | 18,095 | 2,280 | 20,364 | | 6,829 | 3,058 | 10,787 | 17,367 |
| Jun | 396 | 70,052 | 13,081 | 423 | 7,607 | 17,577 | 25,184 | 2,704 | 19,817 | 278 | 8,370 | 8,474 | 13,851 | 19,464 |
| Jul | 334 | 70,318 | 11,641 | 2,004 | 7,511 | 15,510 | 23,021 | 2,641 | 20,048 | | 10,058 | 8,373 | 14,550 | 17,289 |
| Aug | 464 | 57,988 | 4,685 | 900 | 7,511 | 15,062 | 22,573 | 2,607 | 21,466 | | 6,448 | 8,378 | 4,874 | 16,802 |
| Sep | 409 | 67,397 | 14,223 | 719 | 8,187 | 14,506 | 22,693 | 2,718 | 19,807 | | 5,491 | 9,168 | 16,688 | 16,243 |
| Oct | 380 | 63,066 | 3,747 | 1,918 | 10,099 | 15,072 | 25,171 | 2,899 | 20,948 | 99 | 9,290 | 11,262 | 4,659 | 16,808 |
| Nov | 383 | 70,572 | 5,185 | 1,962 | 11,755 | 14,227 | 25,982 | 2,849 | 21,255 | 58 | 13,980 | 13,060 | 6,434 | 13,060 |
| Dec | 375 | 88,699 | 11,721 | 1,470 | 18,046 | 28,654 | 46,700 | 5,133 | 20,184 | 245 | 2,822 | 20,450 | 13,095 | 31,803 |
| **Total** | 4297 | 838642 | 127367 | 15185 | 100905 | 199733 | 300638 | 38091 | 242804 | 20631 | 91308 | 114076 | 144634 | 225189 |
| **Unit Costs** | 195 | | 30 | 4 | 23 | 46 | 70 | 9 | 57 | 5 | 21 | 27 | 34 | 52 |
| **1995 Jan** | 343 | 67,049 | 5,978 | 2,139 | 11,790 | 14,816 | 26,606 | 5,054 | 20,220 | - | 9,131 | 14,030 | 6,038 | 17,630 |
| Feb | 327 | 88,401 | 21,799 | 2,813 | 11,437 | 14,318 | 25,755 | 3,363 | 18,864 | 185 | 17,190 | 13,020 | 22,954 | 16,188 |
| Mar | 424 | 52,684 | 7,003 | 1,995 | 5,322 | 15,418 | 20,740 | 2,488 | 18,987 | | 2,712 | 6,040 | 7,877 | 17,268 |
| Apr | 341 | 84,900 | 32,176 | 782 | 9,493 | 14,409 | 23,902 | 3,099 | 21,020 | | 2,552 | 10,834 | 34,217 | 16,277 |
| May | 420 | 93,676 | 8,772 | 1,604 | 9,432 | 14,337 | 23,769 | 3,080 | 22,686 | 212 | 34,051 | 10,654 | 9,879 | 16,195 |
| Jun | 396 | 75,417 | 11,676 | 1,677 | 9,432 | 15,049 | 24,481 | 3,222 | 17,300 | | 17,718 | 12,686 | 17,030 | 17,030 |
| Jul | 352 | 64,078 | 6,803 | 391 | 11,105 | 13,877 | 24,782 | 4,746 | 16,895 | | 13,232 | 13,232 | 7,332 | 16,296 |
| Aug | 423 | 77,699 | 9,740 | 1,520 | 10,310 | 14,632 | 24,942 | 4,790 | 20,127 | | 14,571 | 12,290 | 13,269 | 17,442 |
| Sep | 373 | 66,740 | 10,303 | 655 | 10,269 | 14,212 | 24,481 | 3,544 | 17,881 | 18 | 10,363 | 11,756 | 10,463 | 18,289 |
| Oct | 357 | 73,724 | 8,530 | 1,116 | 11,255 | 16,804 | 28,059 | 3,934 | 22,136 | | 10,952 | 12,833 | 8,843 | 19,180 |
| Nov | 310 | 63,802 | 5,455 | 1,870 | 13,849 | 10,791 | 24,640 | 3,917 | 18,981 | | 10,537 | 16,051 | 5,727 | 12,508 |
| Dec | 289 | 82,065 | 6,348 | 1,631 | 15,171 | 25,767 | 40,938 | 3,184 | 28,842 | | 2,671 | 16,351 | 6,430 | 27,171 |
| **Total** | 4355 | 890235 | 134581 | 16979 | 128865 | 184230 | 313095 | 44421 | 249938 | 415 | 142761 | 147763.6 | 145325 | 210032.4 |
| **Unit Costs** | 204 | | 31 | 4 | 30 | 42 | 72 | 10 | 56 | 0 | 33 | 34 | 33 | 48 |
| **1996 Jan** | 259 | 50,930 | 6,838 | 483 | 7,197 | 11,852 | 19,049 | 3,025 | 18,837 | | 2,868 | 8,340 | 7,151 | 13,734 |
| Feb | 315 | 69,845 | 10,451 | 1,779 | 5,176 | 14,420 | 19,596 | 2,887 | 33,690 | | 2,870 | 5,939 | 10,802 | 16,544 |
| Mar | 331 | 38,743 | 28 | | 5,355 | 12,361 | 17,716 | 2,239 | 16,689 | | 71 | 6,032 | 28 | 13,923 |
| **Total** | 905 | 157518 | 17317 | 2262 | 17728 | 38633 | 56361 | 8151 | 69216 | - | 5809 | 20310.23 | 17981 | 44201.77 |
| **Unit Costs** | 174 | | 19 | 2 | 20 | 43 | 62 | 9 | 76 | - | 6 | 22 | 20 | 49 |

G00029

1)  Resurgens Surgery Center, Inc.(Facility) bank account has been reconciled to September 30, 1996 period ending; the earned income due to PSPM equal $49,593.92.  A check has been cut to PSPM.

2) A meeting with Resurgens Surgery Center is scheduled for October 11, 1996 to complete the following tasks:

    a)  Obtain signature on check cut to distribute facility funds to PSPM.

    b) Plan for RSC to take over the reconcilement and distribution of funds going into the facility account as of January 1, 1997.  PSA will continued to reconcile and distribute funds monthly until the cut off date of Janaury 1, 1997.

    c)  Possible closure of the facility lockbox; ultimately closure of the account.

3)  The income earned and collected on behalf of the PSPM Managed Care account  from March 1, 1996 through September 30, 1996  is $178,252.55 and a check has been cut to PSA ; Ultimately to be transferred into the new PPS account.

4)  The balance as of September 30, 1996 in the PSPM Operating Account is $75,804.47;  the funds were moved into the PSPM Money Market account today.

| | |
|---|---|
| PSPM Operating account | $ 75,804.47 |
| PSPM Money Market account | $ 47,010.11 |
| Facility funds transfer to PSPM | $ 49,593.92 |
| **Total PSPM funds available as of 9/30/96** | **$ 172,408.50** |

**PSA Business Meeting**

**Meeting Minutes - August 26, 1996**

The meeting was called to order by PSA President Steve Sween at 6:00 PM.

In attendance: Drs. Sween, Mogelnicki, Foster, Byrne, Chambers, Dijamco, Lebert, Little, McLeod, Rathmell, Schinelli, Stephenson, Taylor, Wells, Yilling, and Bob Allen

The standard business portion of the meeting was preceded by a brief presentation from Kelly Young, Jan Holland and Patricia Grossbaum of Saint Joseph's Hospital concerning the opening of Saint Joseph's 'Specialty Center for Wellness and Rehabilitative Care', located on Abernathy Road. Their discussion covered the many programs that will be offered at this CORF facility that focus on both fitness and rehabilitative care. The first patients will be seen at the facility on September 16, 1996, with an Open House scheduled for September 19th.

I.  Review of Minutes, PSA July Business Meeting

     The minutes from the last business meeting were distributed in advance and approved as distributed.

II. Monthly Reports

     A. Administrators Report                                              Mr. Allen

          Mr. Allen presented, via overheads, graphs and data representing both utilization and reimbursement information for the most recent past month (July) and for the year to date. He reported that in the past month, utilization and reimbursement figures had resumed their predicted budgetary levels after having fallen off slightly in the month of June. This was particularly noteworthy having occurred in the  same month as the Olympic games in Atlanta. Parkway Regional, in particular, had a record number of surgical cases. Dr. Lebert noted that historically, the Summer months typically experience higher OR utilization, especially for outpatient procedures. Dr. Mogelnicki also noted that Resurgen's volume had remained steady, despite the fact that Dr. Woodfin and several other surgeons had been involved with the Olympic games. He also recommended that payor mix trends be shown on a quarterly basis, as their fluctuation on a month to month basis typically was not great.

     B. Medical Director's Report                                        Dr. Mogelnicki

          [Written Report Submitted] Dr. Mogelnicki discussed the details of the meeting he and Bob Allen had with Suzanne White and Art Kutner of Saint Joseph's Hospital concerning the HCFA Heart Project and the proposed expansion of this project to include valve procedures in 1997. Of significance, Dr. Mogelnicki noted that in the meeting, he had emphasized the contributions the anesthesia department had made in reducing costs for the hospital over the past year and a half, and his concern that the department's past and future efforts to contain costs would be diluted through inefficient surgical operating practices and negative outcomes that contribute to increased, rather than decreased, costs. He also reported that the department's reimbursement rate for CABGs had increased to $1,076 in 1996, from $1042

000495

the prior year, and that a reimbursement check reflecting a pro-rata distribution based on the new rate for all HCFA hearts performed since the beginning of the year, would be received from the Hospital in the very near future. At this point, Bob Allen distributed and Dr. Mogelnicki reviewed, with all physicians present, a letter from the hospital detailing the computation of the variable costs that were considered in deriving the new rate.

C. Presidents Report                                        Dr. Sween

[Written Report Submitted] Dr. Sween noted that the recent decline in the per share price of Medaphis stock would not have any impact on the level of commitment PSA would receive from Medaphis in its billing and collections efforts. He also noted the change in long-term disability carriers from Northwestern to Paul Revere, which changed the maximum monthly benefit to $5,000 per month following a 90 day waiting period. This change was made due to a dramatic increase that would have been incurred by the practice in its monthly premium had it stayed with Northwestern. In other business, Dr. Sween announced that Dr. Lebert had been approved as a full partner in the special Shareholder's meeting following the past business meeting. He also noted that the Summer Picnic had been a success, with over 100 people in attendance. From a legal perspective, he noted that incorporation papers had been received by Decker and Hallman pertaining to the formation of PPS (Physician Pain Specialists), which will be the new, wholly owned subsidiary of PSA for its pain management services. He also noted that in the near future, Bob Allen would be meeting with Ed Hallman and Nick Chaffin to discuss next steps in activating PPS and dissolving PSPM. Finally, Dr. Sween reported that no news had been reported from the attorneys for Drs. Rizor, Porter and MacNeill.

D. Secretary / Treasurer's Report                          Dr. Foster

Report deferred to later in meeting.

E. Section Chiefs

   1. Cardiac                                               Dr. Carlson

   No report. Dr. Carlson on vacation. Written report received upon Dr. Carlson's return from vacation.

   2. General                                               Dr. Wells

   [Written Report Submitted]

   3. Outpatient                                            Dr. Dijamco

   [Written Report Submitted] Following Dr. Dijamco's presentation, Dr. Sween inquired about recent reports of missing narcotics at Resurgens, and noted the need for better control and accounting for narcotics in the future.

   4. Pain Center                                           Dr. Rathmell

   [Written Report Submitted] Dr. Rathmell reported that the number of new patients being seen in the pain center were approximately equal to the same mark achieved a year ago

when Drs. Rizor, Porter and MacNeill were primarily in control of the pain center. He also reported that Sharon Murray had been let go from the pain center, which was followed by a brief discussion of staffing alternatives and replacements, including possible consideration of hiring a PA. No decision was made. Dr. Rathmell further discussed plans to start a new pain support group, to be led by Cher Riddell. Discussion of reimbursement for this group and reimbursement alternatives resulted in a consensus that a flat rate of $60 should be charged, and that if third party carriers will reimburse for a group therapy code that this would be used in lieu of the flat rate if a participant's carrier allowed this charge. Dr. Rathmell also noted that he had performed the center's first RF procedure at Stella Maris, and that he would work on developing a protocol for screening patients for this procedure. Dr. Yilling suggested that Dr. Max Stoyer be consulted when developing this protocol. Finally, Dr. Rathmell noted that work in attaining AAAHC accreditation would involve everyone's participation, and requested that anyone interested in assisting in this effort please see him. Dr. Yilling added, following Dr. Rathmell's presentation, that the twice monthly patient care conferences held on the first and third Tuesdays be changed to being held only once a month on the first Tuesday of the month.

5. CQI                                                    Dr. Chambers

Verbal report presented. Dr. Chambers discussed details related to the paperwork to be filled out as part of the CQI process, and noted that input and feedback from all physicians is needed in order to implement improvements. Dr. Stephenson suggested that a CQI process and policy be developed as part of the accreditation process in the pain center.

6. Parkway                                               Dr. Lebert

[Written Report Submitted] Dr. Lebert noted that July's utilization, as previously noted by Bob Allen, had increased significantly in the past month. He also noted that PSA had just completed its first year of contracting with Parkway Regional, and reported that he and Dr. Mogelnicki had met with Debbie Guthrie, Administrator for Parkway Regional, to discuss details related to the renewal of PSA's contract with Columbia. Dr. Lebert further reported that the anesthesia staff was short one anesthetist due to the resignation of Alan Smith, and was in the process of recruiting a replacement. With regard to his own presence at Parkway, Dr. Lebert noted that his presence at Parkway would be scaled down to two days per week, on average, and that the days he would be at Parkway, Dr. Beatty would replace him on the Saint Joseph's schedule.

7. Education                                             Dr. Schinelli

[Written Report Submitted] Dr. Schinelli reminded everyone of ACLS training on the 14th of September, and noted that several drug reps were being contacted to solicit their assistance in providing meals and snacks for this event. With regard to the next Journal Club meeting, Dr. Schinelli suggested that the next meeting be held in a physician's home, and asked for any volunteer to contact him.

8. Pension                                               Dr. McLeod

Verbal report presented. Dr. McLeod reviewed an issue that had been successfully resolved related to the incorrect overpayment and disbursement of funds into the pension accounts of Drs. Rizor, Porter and MacNeill. Dr. McLeod reported that the misallocated

funds had been recovered and redeposited into PSA's pension plan several days after this mistake had been identified.

9. AOSS - Urology                                            Dr. Sween

Dr. Sween reported that anesthesia was now being used in association with almost every lithotriptor case at AOSS. No other news was reported.

III. Old Business

A. Manpower                                                 PSA Board

Dr. Sween noted that one additional anesthetist may need to be recruited to fill the void made when Linda Brier changes her status to part-time. No other staffing issues were discussed.

B. Medaphis                                                 Dr. Sween

Report given during President's report.

C. Physician Schedule                                   Dr. Foster, Mr. Allen

Dr. Foster noted that attempts would be made to have a new MD schedule for the first quarter of 1997 available in early November. To do so, a special meeting would be convened in mid-October to select and determine vacation choices and preferences in 1997. Dr. Foster reported that he would distribute a memo in the near future to announce plans for this meeting. Methods in how to distribute available time for vacations was also discussed. After much debate, it was decided to distribute vacation time based on whole weeks, rather than partial weeks. It was also decided, based on a motion made by Dr. Foster and seconded by Dr. Sween, to extend the number of vacation weeks to nine in 1997. Dr. Foster also discussed the subject of having a select group of physicians use the timeclock for a period of three to four months to study time usage trends. Pros and cons were discussed related to this subject. Dr. Foster noted that use of the timeclock would help validate hours worked in PSA's various locations, and would provide a method for attaining greater equity in preparing the M D schedule in the future. To the negative, it was pointed out that compliance would be difficult, that use of the timeclock is demeaning to professionals, and that a sample period of greater than six months would be necessary to attain quality data. Nevertheless, the group agreed that a portion of the practice's M Ds would participate in this study. Finally, Dr. Foster turned the final part of this portion of the meeting over to Dr. Yilling, who presented an informal study he conducted, which he named the "Misery Index", which addressed the negative impact physicians who are not routinely scheduled in the main OR (i.e. pain M Ds) have with regard to exposure to heart cases in the main OR.

IV. New Business

A. Anesthetist Issues                                     Dr. Sween

Dr. Sween reported on several items that had recently been discussed with the anesthetist staff, including a request made by Ed Solava to change his status as a 12-hour heart

030498

anesthetist to that of a regular 8-hour anesthetist (request denied by the Board), and discussion of reinstituting annual performance evaluations, which will be conducted in October.

B. Group Disability Insurance                                Dr. Sween

Covered during President's report.

C. Vacation Schedules                                        Dr. Sween

Discussed during discussion on Physician schedules.

D. Saint Joseph's Mercy Foundation 1996 Golf Classic

Dr. Sween announced the Board's recommendation that the practice contribute and attend Saint Joseph's annual Golf Classic in support of the Mercy Foundation. After a brief discussion, all present agreed with the Board's recommendation to participate in this event.

E. Atlanta Pain Network                                      Dr. Sween

Dr. Sween updated those present with the efforts of Medaphis in conducting its feasibility study with regard to establishment of a pain network. In particular, Medaphis has begun conducting interviews with area employers and insurance/managed care companies. A final report of their findings will be presented in approximately six weeks.

F. ASA/GSA Politics

Dr. Sween reported on the recent GSA meeting that he attended in Hilton Head. He noted that Dr. John Neel of Northside was in line to become the next President of the ASA. With regard to issues discussed at the meeting, he noted that the biggest issue is with the AANA's position on scope of services. He reported that the AANA is seeking to replace anesthesiologists in many hospitals across the country or want equal status where they work together. Dr. Sween reported that the ASA and GSA PACs were actively trying to raise funds to support candidates that will listen to the ASA's views. He noted that only seven M Ds from the practice had contributed to the GSA this year, and requested that PSA consider giving to the GSA PAC as a whole on behalf of each of its physicians. Statewide, only 8% of all anesthesiologists had contributed to the GSA PAC. After a brief discussion, those present agreed to support the GSA PAC with a contribution equal to $150 per M D.

H. Cross Connection

Dr. Sween reported that Dr. Wells will not be participating with the Cross Connection trip this year, but that Dr. Yilling has indicated that he will go to El Salvador instead in November. Dr. Carlson also is considering going. Pedro Casanova also has indicated that he will not be going, but Sandra Madriaga will most likely go in his place.

V. Miscellaneous

030499

A. Next Meeting Monday, September 23, 1996

Dr. Sween announced the next PSA Business Meeting would be held on September 23, 1996, and that the Parkway physicians would be invited to attend this and future Business Meetings.

There being no further business, the meeting was adjourned at 9:40 PM.



# Pain Center Gross Collections

Legend: ■ Professional ■ Facility

Months: Dec-95, Jan-96, Feb-96, Mar-96, Apr-96, May-96

Y-axis: 0, 10,000, 20,000, 30,000, 40,000, 50,000, 60,000, 70,000, 80,000

Physician Specialists in Anesthesia

EXHIBIT "13"

000078

# Physician Specialists in Anesthesia
## 1997 Statistical Budget Assumptions

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total | 10 Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Venues** | | | | | | | | | | | | | | |
| Saint Joseph's | 791,341 | 769,905 | 684,109 | 685,426 | 775,285 | 678,851 | 805,160 | 930,007 | 904,371 | 804,200 | | | 8,238,654 | 823,865 |
| Parkway | 109,764 | 93,504 | 127,744 | 117,558 | 124,089 | 99,565 | 98,842 | 87,717 | 125,935 | 128,181 | | | 1,112,879 | 111,288 |
| Pain Center | 65,950 | 59,366 | 85,510 | 91,301 | (148,064) | | | | | | | | 164,063 | 16,406 |
| Radiogas | 61,285 | 70,500 | 62,209 | 68,118 | 67,310 | 53,423 | 60,442 | 63,668 | 84,510 | 104,031 | | | 695,694 | 69,569 |
| Urology | 7,423 | 14,256 | 3,961 | 45,489 | 36,287 | 26,400 | 34,889 | 33,765 | 32,633 | 46,824 | | | 281,906 | 28,191 |
| Less Collection Expense | (5,738) | | (18,595) | (3,431) | (6,075) | (12,462) | (237,579) | (5,307) | (102,687) | (84,724) | | | (444,137) | (44,414) |
| Less Returns & Ret Checks | 3,960 | (9,767) | (12,695) | (10,175) | (24,814) | | (12,657) | (18,711) | (17,866) | (18,933) | | | (134,121) | (13,412) |
| Net venue | 1,033,985 | 997,763 | 1,152,242 | 1,194,283 | 823,969 | 845,777 | 749,077 | 1,091,337 | 1,028,896 | 869,579 | | | 9,914,939 | 991,494 |
| **Professional** | | | | | | | | | | | | | | |
| Physicians | 438,581 | 298,115 | 365,749 | 296,399 | 614,129 | 266,904 | 690,342 | 344,802 | 1,296,439 | 378,692 | | | 4,980,153 | 498,015 |
| PA's | 148,417 | 151,259 | 150,747 | 157,225 | 153,186 | 204,669 | 152,416 | 159,147 | 157,232 | 125,927 | | | 1,560,228 | 156,023 |
| PA P/T | 9,466 | 13,311 | 10,528 | 10,178 | 5,652 | 10,048 | 7,397 | 7,178 | 10,288 | 8,078 | | | 92,104 | 9,210 |
| CRNA | 76,157 | 75,599 | 92,425 | 68,963 | 58,609 | 37,002 | 71,548 | 99,412 | 83,177 | 80,133 | | | 741,016 | 74,102 |
| CRNA P/T | 3,869 | 2,275 | 2,860 | 2,763 | (1,560) | 578 | 578 | 1,687 | 780 | 780 | | | 13,071 | 1,307 |
| RNN | 3,359 | 3,359 | 3,359 | 3,359 | 3,359 | 3,359 | 3,359 | 3,359 | 3,359 | 3,359 | | | 33,591 | 3,359 |
| RN P/T | 2,047 | 2,858 | 2,495 | 2,714 | 1,938 | 3,157 | 2,335 | 3,042 | 3,025 | 2,674 | | | 28,283 | 2,828 |
| Casual Labor | 282 | 1,760 | | | 171 | | 1,453 | | 107 | 1,000 | | | 4,792 | 479 |
| ADP Expense | 1,181 | 80 | 1,079 | 466 | 130 | 218 | 757 | 729 | 442 | 657 | | | 5,719 | 572 |
| Business Expense | 25,780 | 8,712 | 20,320 | 4,868 | 11,845 | 6,131 | 3,230 | 10,707 | 7,971 | 5,874 | | | 103,668 | 10,367 |
| Consultants | | | 500 | 400 | 500 | 300 | (300) | | | | | | 900 | 90 |
| Contributions | | | | | | | | | 8,000 | | | | 8,500 | 850 |
| Other Contributions | | | | | | | | | 2,350 | 250 | | | 2,600 | 260 |
| / & Meetings | | 1,087 | 38 | 4,700 | | | | | | | | | 6,743 | 674 |
| Continuing Education | 4,083 | 523 | 3,213 | 3,674 | 1,843 | 1,612 | 2,470 | 450 | 633 | 3,103 | | | 21,604 | 2,160 |
| Business Expense - RJA | | | 3,041 | 258 | 1,467 | | 70 | 36 | | | | | 4,883 | 488 |
| Dues & Subscriptions | 618 | 665 | 865 | 3,525 | | 1,175 | (201) | 100 | 225 | 179 | | | 7,151 | 715 |
| Employee Welfare | | 258 | 460 | 504 | | 2,646 | 370 | 100 | | 100 | | | 6,913 | 691 |
| Meals | 696 | 152 | 480 | 3,172 | 798 | 129 | 110 | 3,035 | | | | | 5,516 | 552 |
| Entertainment | 13,588 | | (4,190) | | | | | 4,623 | | (1,200) | | | 13,340 | 1,334 |
| Equipment Rental | 714 | 88 | 1,579 | 671 | 521 | | 52 | 135 | 50 | 40 | | | 3,388 | 337 |
| Gift Expense | 3,459 | | 100 | | 39 | | | | | | | | 3,559 | 356 |
| Insurance | 300 | | 56,927 | 1,976 | | 54,653 | 5,355 | | 60,406 | | | | 179,617 | 17,962 |
| Insurance - Malpractice | 45,273 | (3,384) | 4,701 | 10,591 | 12,657 | 5,413 | 2,664 | (152) | 4,724 | 5,263 | | | 87,749 | 8,775 |
| Interest Expense | 4,760 | 4,760 | 2,782 | 1,530 | | | | 1,706 | 1,672 | 1,588 | | | 14,038 | 1,404 |
| Laundry & Uniforms | | 323 | | | 250 | 76 | 300 | | 365 | (1,314) | | | | |

EXHIBIT "14"

000080

**...ician Specialists in Anesthesia (In and Outpatient)**
**Practice Analysis Assumptions**
**...ptions based on January - October 1996 Payer Mix, Charge Volume & Collection Data**

| Percentage Net Gross Charges | Total Net Gross Charges | Projected Gross Charges | COA as % of Gross Charges | COA Amount | Unbillable as % of Gross Charges | Unbillable Amount | Total Charge Adjustment | Adjustments as % of Gross Charges | Projected Net Charges | Net Bad Debt as % of Gross Charges | Net Bad Debt Amount | Projected Collectible Amount | Refunds | Projected Net Collectible Amount | Gross Collection % | Net Collection % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4% | 707,200 | 848,383 | 0% | 0 | 1.87% | 15,828 | 15,828 | 1.87% | 832,555 | 5.18% | 43,603 | 788,952 | N/A | 788,952 | 92.70% | 94.57% |
| 9.6% | 1,421,525 | 1,683,788 | 13.4% | 226,933 | 1.87% | 31,651 | 238,384 | 15.33% | 1,427,603 | 5.33% | 90,016 | 1,336,789 | N/A | 1,336,789 | 79.30% | 93.65% |
| 24.5% | 3,669,626 | 4,266,601 | 2.0% | 83,729 | 1.87% | 79,962 | 163,682 | 3.87% | 4,120,319 | 5.39% | 230,386 | 3,889,953 | N/A | 3,889,953 | 90.70% | 94.41% |
| 1.0% | 187,770 | 179,150 | 30% | 89,355 | 1.87% | 3,342 | 92,917 | 31.87% | 86,233 | 5.39% | 9,630 | 76,603 | N/A | 76,603 | 42.70% | 88.81% |
| 29.5% | 2,218,854 | 3,160,613 | 71% | 1,814,720 | 1.87% | 96,278 | 1,910,998 | 75.79% | 1,249,615 | 5.38% | 277,398 | 972,217 | N/A | 972,217 | 18.60% | 77.80% |
| 2.7% | 300,437 | 471,422 | 69.9% | 330,929 | 1.87% | 8,833 | 339,762 | 71.7% | 133,671 | 5.18% | 25,448 | 108,222 | N/A | 108,222 | 22.80% | 80.90% |
| 19.2% | 2,195,936 | 3,368,109 | 40.2% | 1,354,809 | 1.87% | 62,840 | 1,417,649 | 42.09% | 1,950,660 | 5.38% | 181,055 | 1,769,604 | N/A | 1,769,604 | 52.50% | 90.72% |
| 3.6% | 1,337,543 | 1,514,789 | 25.7% | 389,301 | 1.87% | 28,260 | 417,561 | 27.57% | 1,097,228 | 5.39% | 81,424 | 1,015,804 | N/A | 1,015,804 | 67.06% | 92.59% |
| 100% | 14,668,659 | 17,516,481 | 35.9% | 6,291,987 | 1.87% | 326,794 | 6,618,781 | 37.79% | 10,897,705 | 5.38% | 841,642 | 9,996,643 | 54,874 | 9,991,269 | 56.53% | 90.84% |

Revision Date 9/2/96

C:\CLIENTS\PGA0197 XLS InOut Assumptions

**EXHIBIT "15"**

**State Health Planning Agency**

4 EXECUTIVE PARK DR . N.E. / ATLANTA, GEORGIA 30329
Suite 2100
(404) 320-4821
GIST 238-4821

December 17, 1992

**CERTIFIED MAIL**
**Return Receipt Requested**

The Resurgens Center, Inc.
d/b/a Resurgens Surgical Center
5761 Peachtree Dunwoody Road
Atlanta, Georgia  30342

Attention:  Steve Ember, Administrator

Gentlemen:

The State Health Planning Agency hereby approves your request (SA. 098-92) in accordance with the State Certificate of Need Law, for the purpose of establishing a physician-owned, limited-purpose ambulatory surgery center restricted to orthopedic procedures.  The applicant has made a commitment to provide a minimum of 3% of the center's gross revenue, less bad debt, Medicare and Medicaid contractuals, for the provision of indigent and charity care.  No capital costs are associated with this project.

Your certificate is valid for a period of twelve (12) months, unless extended for good cause.  It is important that the administration of your project be consistent with the Certificate of Need rules. We are, therefore, enclosing "Performance Approval Period Requirements" which outlines the duration, progression and extension provisions (if needed) which apply to this approval.

Please be advised that a decision by this Agency is subject to appeal within thirty (30) days from the date of this letter.  Should a bona fide request for an appeal be received, you will be promptly notified and the Certificate of Need will be suspended until the appeal is resolved. You are strongly advised not to make a substantial obligation of funds until the time period for requesting an appeal has expired.

000414

Project No. GA. 098-92
December 17, 1992
Page Two

The approval of a project by the State Health Planning Agency does not assure that any amount or rate of reimbursement will be paid by the Department of Medical Assistance, the Medicare intermediary, or any other payment source.

Should you need additional information pertaining to this communication, please contact this Agency.

Sincerely,

*Pamela S. Stephenson*

Pamela S. Stephenson
Director, Regulatory Review

PS:jv

Enclosures:   Evaluation
Performance Approval Period Requirements
Progress Report Form
Project Implementation Schedule

xc:   Russ Toal, Commissioner, DMA
Health Care Section, DHR/ORS
State Architect
Howard E. Fagin, Ph.D.

000415

STATE HEALTH PLANNING AGENCY
Evaluation for Certificate of Need

Project No. GA. 098-92         The Resurgens Surgical Center
                               Atlanta, Fulton County

The Resurgens Center, Inc., a Georgia corporation d/b/a Resurgens Surgical Center
(RSC) has requested that the State Health Planning Agency issue a Certificate of
Need (CON) to establish a physician-owned, limited purpose ambulatory surgery
center restricted to orthopedic procedures.  The ambulatory surgery center would
be owned and operated exclusively by seven orthopedic surgeons: John C. Garrett,
M.D.; Drew V. Miller, M.D.; George Cierny, M.D.; Michael Miller, M.D.; Blane A.
Woofin, M.D.; Kenneth J. Kress, M.D.; and Keith Osborn, M.D.  The ambulatory
surgery center would consist of three operating rooms and two recovery rooms
which are near the physician's offices and located, since November, 1991 at 5761
Peachtree Dunwoody Road, Suite 800.   This site, serving primarily the
metropolitan Atlanta area is on the eighth and ninth floors of the Center for
Specialty Medicine adjacent to St. Joseph's Hospital.  RSC is accredited by the
Accreditation Association for Ambulatory Health Care, Inc.  There are no capital
costs associated with this project.

The rules for physician-owned, limited purpose ambulatory surgery centers allow
a physician's office that has provided ambulatory surgery to become a physician-
owned, limited purpose ambulatory surgery center.  These types of facilities are
exempt from the need method used to project need for ambulatory surgery centers
and certain other criteria required under Rule 272-2-.09(1)(b)1-7.

The proposal was reviewed in terms of the following standards and considerations:

Rule 272-2-.08(1)(b)2: The population residing in the area served, or to be
                       served, by the new institutional health service has a need for such
                       services.

The Agency relied on the following service specific rules to quantify project
need.


Rule 272-2-.09(1)(b)8(i):  The proposed facility must indicate that it will meet
                           the definition of an ambulatory surgical center in Rule 272-2-
                           .09(1)(a)2.

Rule 272-2-.09(1)(a)2 defines an ambulatory surgery center as:  Ambulatory
Surgical Center (ASC) to comply with Federal guidelines, means any distinct
entity that operates a program exclusively for the purpose of providing surgical
services to patients not requiring hospitalization.  ASCs may be operated by a
hospital or an entirely separate entity.  The ASC operated by a hospital must be
a separately identifiable entity, physically, administratively and financially
independent and distinct from other operations of the hospital.  Such term does
not include the offices of private physicians or dentists, whether for individual
or group practice.  An ambulatory surgery center owned/operated by physicians
shall meet the definitions of "ambulatory surgical center," 272-2.09(1)(a)2, and
"ambulatory surgery," 272-2.09(1)(a)1, and shall demonstrate a distinct financial
and administrative structure from the physician's office.

000416

The applicant has provided information which documents that the physician-owners have established a separate distinct financial and administrative structure from the physician's office.  Separate from the physician offices are three (3) operating rooms; two recovery rooms including patient toilet and storage rooms; staff scrub and changing areas with clean and soiled utility rooms and electrical room; and, a separate reception, bookkeeping and business/medical records area. The information provided indicates that the proposed physician-owned, limited propose ambulatory surgery center would meet the required definition.

This criterion is met.


Rule 272-2-.09(1)(b)8(ii): The proposed facility must be in proximity to the
                          physician(s) office, i.e., no more than short walking
                          distance, and must share a common waiting room with the
                          physician(s) office.

The proposed ambulatory surgery center is located next to the offices of the physician-owners and shares a common waiting room.

This criterion is met.


Rule 272-2-.09(1)(b)8(iii):  The proposed facility is owned, operated and
                          utilized by a physician(s) who is (are) single specialty.

The seven physician-owners are orthopedic physicians and surgeons.  This constitutes a single specialty, and these physicians exclusively will operate and utilize the RSC facility.

This criterion is met.


Rule 272-2-.09(1)(b)8(iv): The proposed facility provides substantiation that
                          it has given written notification of the intent to establish
                          the facility to any and all hospitals to which the physician
                          owner(s) has (have) admitting privileges.  Such notification
                          must be no later than 30 days prior to the submission of the
                          application.

The applicant has provided copies of the notification letters to Piedmont and St. Joseph's Hospital of Atlanta where the physician owners have full admitting privileges; and, in the case of St. Joseph's, a formal written patient transfer agreement assuring admission of RSC patients.

This criterion is met.


000417

Project No. GA. 098-92      ~e Resurgens Surgical Center                     3

Rule 272-2-.09(1)(b)8(v):  The proposed facility has active accreditation at the
                           time of the Certificate of Need application for performing
                           ambulatory surgery by the national accrediting association for
                           ambulatory surgery or by an appropriate national accrediting
                           body for the specialty practice.

The facility was accredited by the Accreditation Association for Ambulatory
Health Care, Inc. for three years beginning July 10, 1992.

This criterion is met.


Rule 272-2-.09(1)(b)8(vi): The proposed facility is to have no more than two
                           operating rooms and a recovery area or room when there are
                           three or fewer physicians in the entity that owns or operates
                           the facility and no more than three operating rooms and two
                           recovery rooms or areas when there are four or more physicians
                           in the legal entity that owns or operates it.

The proposed project involves seven physicians, three operating rooms, and two
recovery rooms; all consistent with the requirements specified in this rule.

This criterion is met.


Rule 272-2-.09(1)(b)8(vii):The proposed facility has in place a mechanism for
                           peer review, medical audit and tissue review.  The physician
                           owner(s)/operator(s) does (do) not comprise a majority of
                           membership in these review processes.

The applicant has in place a mechanism for peer review, medical audit and tissue
review.  The physician-owners do not comprise a majority of membership in these
review processes.

This criterion is met.


Rule 272-2-.09(1)(b)8(viii): The proposed facility is already performing surgical
                           procedures of sufficient level of complexity to justify an
                           ambulatory surgical facility.

The applicant has and currently performs complex surgical procedures involving
traditional orthopedic surgery including over 167: arthroscopy of the knee,
shoulder, elbow, and  ankle; carpel tunnel release and removal of hardware.
These procedures are included by the Health Care Financing Administration for
Medicare reimbursement.

This criterion is met.


000418

Project No. GA. 098-92          Resurgens Surgical Center                    4

Rule 272-2-.09(1)(b)8(ix): The proposed facility has general anesthesia
                          capabilities and has been performing procedures requiring
                          general anesthesia.   This criterion may be waived if the
                          applicant submits sufficient documentation to prove that a
                          significant number of procedures are being performed which are
                          equal to or surpass in complexity those procedures which have
                          traditionally required general anesthesia but which presently
                          are performed with an alternative anesthesia.

The facility utilizes general and epidural anesthesia.

This criterion is met.


Rule 272-2-.09(1)(b)8(x): For the length of time a patient who has had general
anesthesia is recovering, an anesthesiologist, a physician anesthetist, an oral
surgeon or a certified R.N. anesthetist must be present and said personnel must
have been trained in emergency resuscitation procedures and cardiac life-support
systems.

An anesthesiologist from Physicians Specialists in Anesthesia, P.C. is present
the entire time a patient is recovering.   All physicians are trained and
certified in emergency resuscitation and cardiac life support system procedures.

This criterion is met.


Rule 272-2-.09(1)(b)8(xi): The applicant must present evidence that uncompensated
                          services for indigent or charity patients will be offered at
                          standard which meets or exceeds 3 percent of the gross
                          revenues of the total limited-purpose ambulatory surgery
                          facility after provisions for bad debts and Medicare and
                          Medicaid adjustments have been deducted.    The proposed
                          facility shall include an agreement to document on periodic
                          agency surveys any such service provided.

The applicant has made a commitment to provide three percent (3%) of its gross
revenue for indigent and charity patients after provisions for bad debts and
Medicare and Medicaid adjustments have been deducted.    The applicant has
appropriated 3% of its adjusted gross revenue for the provision of indigent and
charity care in its pro forma.  This amounts to $38,880 in Year 1 and $61,560 in
Year 2.  Plans and policies for indigent care are provided and the applicant has
agreed to report the amount of indigent care provided on periodic Agency surveys.

This criterion is met.


000419

Project No. GA. 098-92   7 ~ Resurgens Surgical Center          5

Rule 272-2-.09(1)(b)8(xii):The proposed facility must document the agreement
                  that all Agency surveys will be completed with the
                  understanding that facilities established under Rule 272-2-
                  .09(1)(b)8 will be tallied as a separate category of
                  ambulatory surgery centers.

The applicant has documented its understanding that facilities established under
the physician-owned, limited purpose ambulatory surgery centers will be tallied
as a separate category of ambulatory surgery center. The applicant also agrees
to participate in and complete all Agency surveys.

This criterion is met.


Rule 272-2-.09(1)(b)8(xiv):  The physician's office which proposes to become a
                  physician-owned, limited-purpose ambulatory surgery center
                  has a history of charges that are lower than charges in
                  ambulatory surgery facilities within the geographic area; and

Rule 272-2-.09(1)(b)7(xi):  Documentation or expected charges for patients for
                  a representative sampling of procedures to be performed.
                  The State Agency will determine the list of these
                  procedures and the information needed for documentation.
                  These charges will be compared with like services for
                  reasonableness and cost savings, as well as financial
                  feasibility of the proposed project.

The applicant provided a list of the most common procedures performed at the
center and its associated charges. In order to determine the reasonableness of
the applicant's charges, the Agency compared the charges with existing hospital-
based and freestanding ambulatory surgery programs within the applicant's
geographic service area.  The comparison of charges is illustrated in the
following table which shows the applicant in compliance with these rules:

## AMBULATORY SURGERY CENTERS' CHARGES

| Facility/Procedure | A. Knee* | A. Shoulder | A. Elbow | A. Ankle | Epidural** |
|---|---|---|---|---|---|
| Resurgens Surgical Center | $1,800 | $2,000 | $1,800 | $1,800 | $200 |
| Atlanta Ctr O'patient Surgery | 2,200 | 2,200 | 2,000 | 1,400 | 300 |
| All O'pat P'tres D'woody Ctr | 2,100 | 3,015 | 2,246 | 2,478 | 170 |
| Atlanta Surgicenter | NA | NA | NA | NA | NA |
| DeKalb Medical Center | 2,534 | 3,200 | -0- | 2,358 | 517 |
| Dunwoody O'patient S'center | -0- | -0- | -0- | -0- | -0- |
| Egleston Children's Hosp | 3,821 | -0- | 0-0 | -0- | 920 |
| Emory Clinic Amb Surg Ctr | 1,170 | 765 | -0- | 2,000 | -0- |
| HCA West Paces Ferry Hosp | 4,339 | 5,468 | 4,115 | 3,885 | NA |
| Kennestone Hosp Windy Hill | 2,876 | 4,182 | 3,336 | 3,535 | 615 |
| Northlake Reg Med Ctr | 4,139 | 4,531 | -0- | 4,464 | 519 |
| Northlake-Tucker Amb Surg | -0- | -0- | -0- | 2,150 | -0- |
| Northside Hospital | 2,033 | 2,375 | 2,375 | 2,375 | NA |
| Northside Hosp O'pat Surg | 2,033 | 2,375 | 2,375 | 2,375 | NA |
| Medicus Diag Endoscopy | NA | NA | NA | NA | NA |
| Piedmont Hospital | 1,940 | 2,790 | 2,826 | 2,021 | 535 |
| Scottish Rite Children's | 2,594 | -0- | -0- | 2,444 | -0- |
| TOTAL & NUMBER | 33,579/13 | 32,901/11 | 21,073/8 | 33,285/13 | 3,776/8 |
| AVERAGE CHARGE | $ 2,583 | $ 2,991 | $ 2,634 | $ 2,560 | $ 472 |
| RANGE OF CHARGES | $ 1,170-4,339 | $ 765-5,468 | $ 1,800-4,115 | $ 1,400-4,464 | 170-920 |
| APPLICANT CHARGES | 1,800 | 2,000 | 1,800 | 1,800 | 200 |

Source: SHPA survey for six months ending August 31, 1992.

\*   = Arthroscopy
\*\*   = Epidural Steroid Injection

As indicated in the above table, the applicant's charges are lower than those charges reported by existing hospital-based and freestanding ambulatory surgery programs.  The  applicant's average charge per procedure is lower than the average charged by all other providers for the same procedure; the applicant is lowest or second lowest of up to sixteen other facilities in the range of charges for each surgery procedure surveyed.  The Agency finds the applicant consistent and in compliance with both charge rules stated above.

This criterion is met.

Rule 272-2-.09(1)(b)3(i):  When the applicant is proposing an ambulatory surgical center, each and all of the above criteria must be met plus the following:

> (i) any and all privileges granted to a physician who practices within the center must be privileges granted to that physician at an accredited Georgia hospital and that physician must be an active member in good standing of the hospital medical staff.

All physician-owners are active members in good standing of the medical staff at St. Joseph's Hospital of Atlanta as a letter from that hospital attests.

This criterion is met.

Rule 272-2-.09(1)(b)5:  The applicant shall present a written policy that assures that there will be no discrimination in provision of service based on race, sex, creed, age, religion, or source of payment.

The applicant's written admission policy included in the application states that it accepts patients regardless of race, sex, creed, national origin, age, religion, or source of payment.

This criterion is met.

Rule 272-2-.09(1)(b)7:  To assure quality health care at a reasonable cost, the applicant must provide evidence that all of the following conditions will be met:

Rule 272-2-.09(I)(b)7(i):  Written policies and procedures to assure that its services are or will be coordinated with other community health resources, hospitals, and other organizations.  Those policies must provide for periodic evaluation of their effectiveness.

RSC has provided policies to assure patient services will be coordinated with

other community health resources, hospitals and other resources when appropriate.
The applicant has a procedure to review these policies annually.

This criterion is met.


Rule 272-2-.09(1)(b)7(ii):  Formal patient referral mechanisms for other
                            appropriately needed services.

The applicant has in place referral mechanisms for appropriate needed patient
services including home health.

This criterion is met.


Rule 272-2-.09(1)(b)7(iii):  Written policies and procedures that insure
                             discharge planning that is effective for appropriate follow-
                             up, inclusion of appropriate family, guardian, significant
                             others as well as the patient with periodic evaluation of the
                             effectiveness of these policies.

A copy of the discharge planning and procedure policies were provided.  Criteria
for discharge and instructions for patient follow-up was included in the plan.

This criterion is met.


Rule 272-2-.09(1)(b)7(iv): All requirements and operational procedures required
                           by the Office of Regulatory Services of the Department of
                           Human Resources will be met.

The applicant has agreed in a written statement to meet all of the requirements
and operational procedures required by the Office of Regulatory Services.

This criterion is met.


Rule 272-2-.09(1)(b)7(vi): Qualified personnel will be available to insure a
                           quality service and to meet licensure, certification and/or
                           accreditation requirements.

The applicant's staff are appropriately trained and certified/licensed.  The
facility is accredited by a national accrediting body and meets their staffing
requirements. Staff includes a manager and a receptionist/data entry, a surgical
technician and three registered nurses.

This criterion is met.

000423

Project No. GA 098-92    The Resurgens Surgical Center                    9

Rule 272-2-.09(1)(b)7(vii): Capability and willingness to maintain a policy and
                plan for reviewing patient care including a stated set of
                criteria for identifying those patients to be reviewed and a
                mechanism for evaluating the patient review process.

The applicant has provided a copy of its procedure for quality assurance auditing
of patients records.

This criterion is met.


Rule 272-2-.09(1)(b)7(viii):  Written policies and procedures for utilization
                review consistent with State, Federal and accreditation
                standards.  This review shall include review of the medical
                necessity for the service, quality of patient care, and rates
                of utilization.

The applicant has provided documentation in written policies and procedures to
satisfy the requirements of this rule.

This criterion is met.


Rule 272-2-.09(1)(b)7(x):  All ambulatory surgical services will be performed
                within five miles of at least one full service hospital with
                which it has a written formal patient transfer agreement,
                including a provision that assures that said patients will be
                admitted; or the medical director of the program or the
                physician performing the surgery will have full admitting
                privileges at said hospital; and that ambulance transportation
                is available within a 15-minute response time.

The proposed ambulatory surgery center is located next door (within five miles)
to St. Joseph's Hospital of Atlanta, where RSC has a written transfer agreement
and where all RSC physicians have full staff and admitting privileges.   The
applicant documented that ambulance response time is within 15-minutes.

This criterion is met.

Rule 272-2-.09(1)(b)7(xiv):Provide all information requested by the State Agency.
                In  accordance  with  272-2-.05,  an  application  will  be
                considered  incomplete  unless  all  periodically  requested
                information such as the latest RSC Joint Hospital Questionnaire or
                survey on ambulatory surgical services has been completed and
                returned  to  the  State  Agency.   This  includes  any  parent
                company and all of their facilities in the state when that is
                applicable.  When the applicant or the parent company of the
                applicant has previously offered services in Georgia, the
                previous performance on all criteria and standards will be
                assessed.

000424

Project No. GA. 098-92 · .e Resurgens Surgical Center                    10

The applicant has agreed to provide all of the information requested by the Agency.

This criterion is met.


Rule 272-2-.08(1)(b)1:    The proposed new institutional health services are reasonably consistent with the relevant general goals and objectives of the State Health Plan.

The proposed project is consistent with the Component Plan on Ambulatory Surgery Services which includes a section on physician-owned limited purpose ambulatory surgery centers.  The Component Plan States that physician-owned limited-purpose ambulatory surgery centers are justified if they can assure improved access to less costly, high quality services.  The guidelines contained in the Plan are similar to the specific standards, Rule 272-2-.09(1)(8), which were addressed previously.  The applicant has met all of the requirements specified under those rules.

This criterion is met.


Rule 272-2-.08(1)(b)13:    The proposed new institutional health service fosters improvements or innovations in the financing or delivery of health services; promotes health care quality assurance or cost effectiveness; or fosters competition that is shown to result in lower patient costs without a loss of the quality of care.

The rationale for the exemption for office-based ambulatory surgery centers contained in the State Health Component Plan states that they may be justified if improved access to less costly high quality services can be assured.  If an office-based ambulatory surgery center is able to meet the specific standards, it is considered a cost-effective means of providing ambulatory surgery services. The applicant has met the requirements for developing a physician-owned, limited purpose ambulatory surgery center.

This criterion is met.


Rule 272-2-.08(1)(b)7:    The new institutional health service proposed is reasonably financially and physically accessible to the residents of the proposed  service area and the applicant assures there will be no discrimination by virtue of race, age, sex, handicap, color, creed or ethnic affiliation.

The proposed facility is physically accessible to residents of the service area. The applicant has assured that it will not discriminate in its admission practices and has made a commitment to serve indigent patients.

This criterion is met.

Project No. GA. 098-92     The Resurgens Surgical Center                          11

Rule 272-2-.08(1)(b)3:     Existing alternatives for providing services in the
                           service area the same as the new institutional health service
                           proposed are neither currently available, implemented,
                           similarly utilized, nor capable of providing a less costly
                           alternative, or no Certificate of Need to provide         such
                           alternative services has been issued by the Planning Agency
                           and is currently valid.

There are no alternatives that would allow RCS to become designated as an
ambulatory surgery center. This proposal represents a less costly alternative
for providing ambulatory surgical services.

This criterion is met.


Rule 272-2-.08(1)(b)4:  The project can be adequately financed and is, in the
                        immediate and long term financially feasible.

The applicant has been performing orthopedic surgery procedures in its current
location since 1991. The applicant estimates 720 and 1,080 procedures in the
next two calendar years of operation (1993 and 1994) based on change-over (due
to insurance availability) estimates of 24% and 36% of facility operating room
capacity.  This is stated as a conservative estimate based on the history of
total procedures of seven surgeons, both in the facility and in other area
hospitals. Charges are expected to average $1,800 and $1,900 for 1993 and 1994
respectively.  As an ASC, this volume is estimated to produce revenue over
expenses of $14,234 in the second year of operation. As previously stated, the
applicant's charges are lower than other charges at existing ASC programs in the
service area of the applicant.  As previously stated, the financial projections
include a 3% (of AGR) indigent care commitment.


This criterion is met.


Rule 272-2-.08(1)(b)5:  The effects of the new institutional health service on
                        payors for health services including governmental payors, are
                        not unreasonable.

The proposed charges are reportedly lower than those indicated for the other
ambulatory surgery centers/programs in the geographic service area. The proposed
facility would provide some patients and payors with a less costly alternative
for outpatient surgery.

This criterion is met.



It is the decision of the State Health Planning Agency to ISSUE a Certificate of

It is the decision of the State Health Planning Agency to ISSUE a Certificate of Need to The Resurgens Surgical Center in Atlanta, Fulton County for the establishment of a physician-owned, limited purpose ambulatory surgery center restricted to orthopedic surgery procedures.

Jack Vincent
Review Analyst

Pamela S. Stephenson
Director, Regulatory Review

December 17, 1992
Date of Decision

000427